**NO. 22-2221**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## ELIZABETH KARANIK; CHARLOTTE KARANIK, by her parents and next friends; JOHN KARANIK; KIMBERLY KARANIK; NATALIE PRESSLEY,

*Plaintiffs – Appellees,*

v.

## CAPE FEAR ACADEMY, INC.,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON**

————————

**BRIEF OF APPELLANT**

————————

Patrick M. Mincey
Stephen J. Bell
Vince Eisinger
CRANFILL SUMNER, LLP
101 North 3rd Street
Suite 400
Wilmington, NC  28401

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-2221      Caption: Elizabeth Karanik, et al. v. Cape Fear Academy, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Cape Fear Academy, inc.
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☑YES☐NO
        If yes, identify entity and nature of interest:

        Cincinnati Insurance Company (CIC) has a direct financial interest in the outcome of the
        litigation by reason of insurance coverage.  CIC is a wholly owned subsidiary of Cincinnati
        Financial Corporation (CFC).  CFC is a publicly traded company.  Vanguard Group Inc.
        presently owns more than 10% of CFC stock.  No other entity or individual owns more than
        10% of CFC stock.

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?          ☐YES☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Patrick M. Mincey _____          Date: _____12/08/2022_____

Counsel for: Cape Fear Academy, Inc._____

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUE..........................................................................1

STATEMENT OF CASE ...........................................................................1

SUMMARY OF ARGUMENT ..................................................................6

ARGUMENT ............................................................................................9

    I.    Standard of Review ....................................................................11

    II.    The Loan to CFA Was Not a Grant or Loan of "Federal Financial Assistance" Because It Was Privately Funded....................................11

        A.    Supreme Court Case Law Holds that a "Grant or Loan of Federal Financial Assistance" Must Consist of Federal Funds, Not Private Funds..........................................................12

        B.    SBA Regulations Demonstrate that a "Grant or Loan of Federal Financial Assistance" Must Consist of Federal Funds, Not Private Funds..........................................................15

        C.    Loans Guaranteed by SBA Under the PPP Are Not Made with Federal Funds and So Cannot Constitute "Federal Financial Assistance"................................................................18

    III.    The Loan to CFA Cannot Be, for Title IX Purposes, the Result of an Arrangement Which Had as One of Its Purposes the Provision of Assistance to Any Education Program or Activity Because the "Arrangement" Was a Contract of Guaranty.................23

        A.    The District Court's Holding Would Write the "Contract of Guaranty" Exception Out of the Law...................................23

B.   The District Court Erred in Relying on Whether CFA was "Congress's Intended Recipient".................................................26

IV.   The Court Should Vacate the District Court's Order as to the Karaniks' Breach of Contract Claims and Remand for Further Consideration..........................................................................30

CONCLUSION.....................................................................................31

REQUEST FOR ORAL ARGUMENT ...................................................31

CERTIFICATE OF COMPLIANCE.......................................................32

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Badaracco v. Commissioner*,
     464 U.S. 386 (1984)......................................................................30

*Cannon v. Univ. of Chicago*,
     441 U.S. 677 (1979)......................................................................17

*E.E.O.C. v. Seafarers Int'l Union*,
     394 F.3d 197 (4th Cir. 2005) .......................................................30

*Epic Sys. Corp. v. Lewis*,
     138 S. Ct. 1612 (2018)..................................................................24

*Gallagher v. Croghan Colonial Bank*,
     89 F.3d 275 (6th Cir. 1996) ..........................................................25

*Grojean v. Comm'r of Internal Rev.*,
     248 F.3d 572 (7th Cir. 2001) ...................................................20, 26

*Grove City College v. Bell*,
     465 U.S. 555 (1984)..................................................................14, 27

*Int'l Refugee Assistance Project v. Trump*,
     961 F.3d 635 (4th Cir. 2020) .......................................................11

*Marshall v. Webster Bank, N.A.*,
     No. 3:10-CV-908 JCH, 2011 WL 219693 (D. Conn. Jan. 21, 2011)............26

*Matternes v. City of Winston-Salem*,
     286 N.C. 1, 209 S.E.2d 481 (1974) .............................................19

*Moore v. Sun Bank of N. Florida, N.A.*,
     923 F.2d 1423 (11th Cir. 1991) ...................................................25

*NCAA v. Smith*,
     525 U.S. 459 (1999)..............................................................*passim*

*Peltier v. Charter Day Sch., Inc.*,
    37 F.4th 104 (4th Cir. 2022) .................................................................14, 27

*Preston v. Com. of Va. ex rel. New River Cmty. Coll.*,
    31 F.3d 203 (4th Cir. 1994) ............................................................. 8, 16-17

*Randall v. United States*,
    95 F.3d 339 (4th Cir. 1996) .........................................................................11

*Schafer v. Astrue*,
    641 F.3d 49 (4th Cir. 2011) .........................................................................30

*Springfield Hosp., Inc. v. Guzman*,
    28 F.4th 403 (2d Cir. 2022) .................................................................*passim*

*Tradeways, Ltd. v. United States Dep't of the Treasury*,
    No. CV ELH-20-1324, 2020 WL 3447767 (D. Md. June 24, 2020) ............22

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001).......................................................................................24

*U.S. DOT v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986).....................................................................................27

*United States v. Hersom*,
    588 F.3d 60 (1st Cir. 2009)..........................................................................15

*Verex Assur., Inc. v. John Hanson Sav. & Loan, Inc.*,
    816 F.2d 1296 (9th Cir. 1987) .....................................................................20

**Statutes:**

11 U.S.C. § 525(a) ...............................................................................................22

15 U.S.C. § 636(a)(36).........................................................................................3

15 U.S.C. § 636(a)(36)(F)(ii)(I).................................................................7, 19, 20

20 U.S.C. §§ 1681, *et seq.*...........................................................................*passim*

20 U.S.C. § 1681(a) ..................................................................................6, 10, 17

20 U.S.C. § 1682 ................................................................10, 17

28 U.S.C. § 1292(b) ......................................................1, 5, 6, 30

28 U.S.C. § 1331 ......................................................................1

29 U.S.C. § 794 .................................................................25, 27

42 U.S.C. § 2000d .............................................................*passim*

42 U.S.C. § 2000d-1 ..........................................................17, 25

**Regulations:**

13 C.F.R. § 112.2(b) ................................................................17

13 C.F.R. § 112.2(b)(1) .......................................................8, 17

13 C.F.R. § 112.2(c) ...........................................................17, 26

13 C.F.R. § 113.105 ..........................................................*passim*

13 C.F.R. § 123.5(a) ................................................................18

34 C.F.R. § 106.2(g) .................................................................7

34 C.F.R. § 106.2(g)(5) ..........................................................10

**Rules:**

Fed. R. Civ. P. 12(b)(6) ..........................................................11

**Other Authorities:**

Cong. Research Serv., Applicability of Federal Civil Rights
Laws to Recipients of CARES Act Loans (May 1, 2020),
   https://crsreports.congress.gov/product/pdf/LSB/LSB10459 ...........................23

Coronavirus Aid, Relief, and Economic Security Act,
   Pub. L. No. 116-136, 134 Stat. 281 (2020) ................................9, 28, 29

Dep't of Justice, Title IX Legal Manual,
    https://www.justice.gov/crt/title-ix .................................................................10, 23

SBA, Business Loan Program Temporary Changes;
Paycheck Protection Program,
    85 FR 20811-01 (Apr. 15, 2020) .........................................................................21

SBA, Business Loan Program Temporary Changes; Paycheck Protection
Program—SBA Loan Review Procedures and Related Borrower and
Lender Responsibilities,
    85 FR 33010-01 (June 1, 2020) ...........................................................................21

## JURISDICTIONAL STATEMENT

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Appellees have asserted causes of action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*

The Court has jurisdiction over this appeal because, on November 29, 2022, the Court granted Appellant Cape Fear Academy, Inc.'s ("CFA") petition under 28 U.S.C. § 1292(b) for interlocutory review of the district court's order denying in part and granting in part CFA's motion to dismiss Appellees' amended complaint.

## STATEMENT OF ISSUE

Under the Paycheck Protection Program ("PPP"), the Small Business Administration ("SBA") guaranteed certain loans made by private lenders to employers. Title IX governs the conduct of academic institutions that receive "federal financial assistance," which assistance is defined as *excluding* "contract[s] of . . . guaranty." If an academic institution not otherwise subject to Title IX receives a since-forgiven private loan for which the lender contracted with the SBA for a loan guaranty through the PPP, has the institution received "federal financial assistance" such that the institution is subject to Title IX?

## STATEMENT OF CASE

Appellant Cape Fear Academy, Inc. ("CFA") is a private PreK-12 school in Wilmington, North Carolina. JA12. Appellees Elizabeth Karanik and Charlotte

1

Karanik, by her parents and next friends, John Karanik and Kimberly Karanik (collectively, the "Karaniks"), are former CFA students who were enrolled at CFA during the 2020–21 academic year. JA123.[1]  The Karaniks allege that, during that year, their classmate Natalie Pressley was subjected to "sexual harassment, unwelcome conduct and bullying, on the basis of her sex" by male students. JA27. Pressley raised concerns with CFA staff members, but their attempts to address her concerns were unsatisfactory to Pressley. JA123–124.  The Karaniks allege that, days after the Dean of Students assured Pressley that CFA would investigate the male students, CFA announced that some of the alleged harassers were slated to speak at its 2021 commencement ceremony. JA125.

Upset by this news, Pressley, Elizabeth Karanik, and others prepared a petition urging CFA to cancel the alleged harassers' speaking roles at commencement. JA125.  Elizabeth Karanik then posted the petition, which included the CFA logo and the alleged harassers' names, on Change.org. JA125.  According to the Karaniks, CFA demanded that the petition be removed. JA43.  Elizabeth Karanik claims that, following the removal of the petition, CFA then retaliated by referring her to the student-led Honor Council on disciplinary charges and, subsequently, barring her from participating in graduation events. JA126–127.

---

[1] Natalie Pressley was a plaintiff in the action below when CFA filed this appeal. On December 27, 2022, Ms. Pressley filed in the district court a voluntary dismissal of her claims against CFA with prejudice.

The Karaniks further allege that CFA retaliated against them by disenrolling Elizabeth's younger sister, Charlotte Karanik, for the 2021–22 academic year. JA127. Charlotte Karanik's parents claim that her disenrollment forced her to enroll in public school, damaged her college prospects, and caused her to suffer from anxiety and depression. JA61.

The Amended Complaint asserts seven causes of action: (1) Title IX retaliation as to Elizabeth and Charlotte Karanik; (2) negligent infliction of emotional distress as to Elizabeth Karanik; (3) intentional infliction of emotional distress as to Elizabeth Karanik; (4) breach of contract and violation of the implied covenant of good faith and fair dealing as to Elizabeth Karanik; (5) breach of contract and violation of the implied covenant of good faith and fair dealing as to Charlotte Karanik; (6) negligent infliction of emotional distress as to Charlotte Karanik; and (7) intentional infliction of emotional distress as to Charlotte Karanik.[2] JA127.

The Karaniks allege that CFA was subject to Title IX during the 2020–21 academic year because it received "federal financial assistance" when it received from First Carolina Bank, a private institution, a loan that was guaranteed by the Small Business Administration ("SBA") under the Paycheck Protection Program ("PPP"), 15 U.S.C. § 636(a)(36). JA127–128. The Karaniks allege that CFA

---

[2] The first cause of action in the Amended Complaint is Ms. Pressley's now-voluntarily dismissed Title IX discrimination claim. JA62–70.

received the loan prior to the 2020–21 academic year, and that it was forgiven after the end of that year.  JA127.

CFA moved to dismiss the Amended Complaint for failure to state a claim on January 10, 2022.  JA122.  CFA argued for dismissal of the Title IX claims on the basis that CFA's obtaining a private loan, guaranteed by SBA, cannot qualify as "federal financial assistance" because Title IX exempts "contracts of insurance or guaranty" from the definition of such assistance.  JA130.

In an order issued June 17, 2022 (the "Order"), from which CFA has appealed, the district court granted in part and denied in part CFA's motion.  JA122.  The district court denied CFA's motion as to the Title IX claims.  JA142, JA146.  The court held that loans guaranteed by SBA under the PPP constitute "Federal financial assistance" for purposes of Title IX because they are both (1) a "grant or loan of Federal financial assistance" and (2) "the result of an 'arrangement which has as one of its purposes the provision of assistance to any education program or activity.'"  JA133–135.  The court continued, "[b]y plausibly alleging that CFA had a PPP loan during the 2020–21 academic year, plaintiffs plausibly alleged" that "CFA received 'federal financial assistance' and had to comply with Title IX for the life of its loan."  JA137.  The district court also upheld the Karaniks' state law breach of contract claims, holding that the Amended Complaint plausibly alleged that CFA breached the Karaniks' enrollment contracts.  JA152–153.  However, the district court

dismissed the claims of negligent and intentional infliction of emotional distress. JA148, JA150.

On July 1, 2022, CFA moved the district court to reconsider its Order or, alternatively, to amend the Order by certifying it for interlocutory appeal under 28 U.S.C. § 1292(b). JA154. CFA contended that the district court had clearly erred in holding that a private loan guaranteed by a federal agency constituted "federal financial assistance" for purposes of Title IX—or at least that there was "substantial ground for difference of opinion" on that issue—and that dismissal of the Title IX claims would, in turn, result in dismissal of the remaining breach of contract claims. JA155, JA160, JA163.

By order issued on October 31, 2022, the district court denied CFA's motion for reconsideration but granted CFA's request to certify the June 17, 2022 Order for interlocutory appeal. JA166. The district court found that the issue of "whether receipt of a PPP loan subjects a borrower to Title IX" "is relatively novel and remains unsettled" and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." JA163 (citing 28 U.S.C. § 1292(b)). The district court further stated that, if this Court were to reverse as to the Title IX claims, resulting in their dismissal, "the court would likely decline to continue exercising supplemental jurisdiction over [the Karaniks' state law breach of contract claims]" and dismiss the action. JA163.

On November 9, 2022, CFA petitioned this Court under 28 U.S.C. § 1292(b) for interlocutory review of the district court's Order. On November 29, 2022, this Court granted CFA's petition.

## SUMMARY OF ARGUMENT

Early in the pandemic, Congress enacted the Paycheck Protection Program ("PPP") to "provid[e] small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 409 (2d Cir. 2022). The Small Business Administration ("SBA") administered the PPP by guaranteeing certain loans made by private lenders. JA131 (citing *Springfield*, 28 F.4th at 423). The Karaniks allege that CFA obtained a private loan from First Carolina Bank that SBA guaranteed under the PPP. JA127–128.

Title IX of the Education Amendments of 1972 prohibits sex discrimination in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). For laws that SBA administers, such as the PPP, SBA regulations define Title IX "Federal financial assistance" to include (1) "[a] grant or loan of Federal financial assistance" and (2) "[a]ny other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, *except a contract of insurance or guaranty*." 13 C.F.R. § 113.105 (emphasis added).

6

The district court held that loans guaranteed by SBA under the PPP meet both definitions.[3]  First, the court held that such loans are "loan[s] of Federal financial assistance" because "'the PPP is, in substance and in form, a loan program.'"  JA133 (quoting *Springfield*, 28 F.4th at 423).  "Borrowers receive money under a loan that is registered with and guaranteed by the SBA" (JA134), and under the terms of the PPP, "a lender approved to make loans under [the PPP] shall be deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans" (JA134 (quoting 15 U.S.C. § 636(a)(36)(F)(ii)(I))).  Second, the district court held that loans guaranteed under the PPP are "the result of an 'arrangement which has as one of its purposes the provision of assistance to any education program or activity.'" JA133–135.  The key for the court was that "PPP borrowers are Congress's intended recipients" and "not merely economic beneficiaries of someone else's receipt of federal financial assistance."  JA135.

The district court's first line of reasoning cannot be correct because grants or loans of federal financial assistance must consist of ***federal*** funds.  The Supreme

---

[3] The Order quotes the implementing regulations of the Department of Education ("DOE") rather than of SBA.  *See, e.g.*, JA133.  DOE's definition of "Federal financial assistance" states that it applies only to assistance "authorized or extended under a law administered by the Department," *viz.*, DOE.  34 C.F.R. § 106.2(g).  But as the district court noted in its order denying reconsideration, DOE's and SBA's definitions are "nearly identical."  JA157.  The district court "clarifie[d] that the same analysis applies to the SBA's definition of 'federal financial assistance' . . . as the court applied to the definition of 'federal financial assistance' in [DOE regulations]."  JA157–158.

Court held in *NCAA v. Smith* that Title IX did not apply to the National Collegiate Athletic Association (the "NCAA") because, although its dues-paying members had received federal grants, the members paid their dues to the NCAA with private funds. 525 U.S. 459, 468 (1999). SBA's own regulations defining "Federal financial assistance" further support this distinction between federal and private funds. Particularly probative is SBA's definition of "Federal financial assistance" for Title VI of the Civil Rights Act as "grants and loans of ***Federal funds***." 13 C.F.R. § 112.2(b)(1) (emphasis added). This Court has stated that courts should interpret and enforce Title IX in lockstep with Title VI. *See Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 n.2 (4th Cir. 1994).

The district court's second line of reasoning cannot be correct because Congress and SBA have made clear—including in the very regulation that the district court said it was applying—that "Federal financial assistance" under Title IX cannot be "arranged" through a contract of guaranty. 13 C.F.R. § 113.105. The district court purported to distinguish between the lender as receiving a contract of guaranty and the borrower, CFA, as receiving "Federal financial assistance." But this reasoning would write the "contract of . . . guaranty" exception out of the law because, in the Title IX context, a lender would always be entering into the contract of guaranty, and the operator of the educational program or activity would always be the borrower.

8

The Court should reverse the Order as to its denial of the motion to dismiss the Karaniks' Title IX claims. The Court should also vacate the Order as to its denial of the motion to dismiss the remaining state-law breach of contract claims since the district court indicated that it would likely dismiss those claims rather than exercise supplemental jurisdiction over them, resulting in dismissal of the entire action.

## ARGUMENT

On March 27, 2020, faced with a once-in-a-lifetime pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act or CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). Division A, Title I of the Act was titled the "Keeping American Workers Paid and Employed Act" and included the Paycheck Protection Program (the "PPP"). The PPP was a "temporary program targeted at providing small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 409 (2d Cir. 2022). Congress authorized the Small Business Administration ("SBA") to guarantee private "loans to eligible small businesses, allowing the recipient to seek loan forgiveness if at least 60% of the loaned funds are used for specified expenses, such as payroll." *Id.* "An applicant seeking a PPP loan submit[ted] an application to an authorized lender, which then determine[d] the borrower's eligibility. If the lender wishe[d] to make the loan, it

submit[ted] a guarantee application to the SBA, and then disburse[d] the loan proceeds if the guarantee application [wa]s approved." JA131–132.

Title IX of the Education Amendments of 1972 prohibits sex discrimination in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX does not itself define "Federal financial assistance." However, in authorizing agencies to promulgate regulations enforcing Title IX, Congress limited its grant of authority only to agencies "empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract *other than a contract of insurance or guaranty*." *Id.* § 1682 (emphasis added).

Taking its cue from Congress, SBA promulgated regulations that defined "Federal financial assistance" under Title IX to exclude "a contract of insurance or guaranty." 13 C.F.R. § 113.105. So did a host of other federal agencies, including the Department of Education ("DOE"). *See* 34 C.F.R. § 106.2(g)(5) (DOE); Dep't of Justice, Title IX Legal Manual § II.3 n.10, https://www.justice.gov/crt/title-ix. Like these other agencies, SBA defines "Federal financial assistance" to include (1) "[a] grant or loan of Federal financial assistance" and (2) "[a]ny other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty." 13 C.F.R. § 113.105.

10

The district court held that both of these definitions applied to private loans guaranteed by SBA under the PPP. But such loans cannot be grants or loans of federal financial assistance because they are not made with ***federal*** funds. Nor can such loans be considered an "arrangement" of assistance because Congress and SBA have made clear that "federal financial assistance" under Title IX cannot be "arranged" through a contract of guaranty.

The Court should reverse the Order as to its denial of the motion to dismiss the Karaniks' Title IX claims. The Court should also vacate the Order as to its denial of the motion to dismiss the remaining state-law breach of contract claims.

## I.    Standard of Review

This Court reviews *de novo* orders denying Rule 12(b)(6) motions to dismiss. *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020). "Dismissal for failure to state a claim is proper where it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1996) (quotation marks omitted).

## II.    The Loan to CFA Was Not a Grant or Loan of "Federal Financial Assistance" Because It Was Privately Funded

The loan that CFA received was not a "grant or loan of Federal financial assistance" (13 C.F.R. § 113.105) because it was privately funded by First Carolina Bank. Supreme Court case law holds that, for purposes of Title IX, a "grant or loan

11

of Federal financial assistance" must be made with federal funds. This interpretation of SBA regulations under Title IX coincides with the regulatory language that SBA used in defining "federal financial assistance" under Title VI of the Civil Rights Act (which Title this Court has said should be interpreted in the same manner): "grants and loans of Federal funds." Because CFA's loan was not made with federal funds, it was not a "grant or loan of Federal financial assistance."

A. Supreme Court Case Law Holds that a "Grant or Loan of Federal Financial Assistance" Must Consist of Federal Funds, Not Private Funds

The Supreme Court has made clear that grants or loans of "Federal financial assistance," as the name suggests, must be made with federal funds. In *NCAA v. Smith*, the NCAA moved to dismiss a former athlete's Title IX claims on the basis that the NCAA had not received "federal financial assistance." 525 U.S. 459, 464 (1999). The plaintiff opposed the motion on the grounds that the NCAA's member institutions received federal funds and paid dues to the NCAA, and the Third Circuit accepted that argument. *Id.* at 464–65.

The Supreme Court reversed. *Id.* at 468. The plaintiff had not alleged that the NCAA had received "federal financial assistance," the Court held, because "there [wa]s no allegation that NCAA members paid their dues with ***federal funds*** earmarked for that purpose." *Id.* at 468 (emphasis added). In other words, the NCAA "indirectly benefit[ed] from the federal assistance afforded its members," but

12

the actual payments that the NCAA received were privately funded. *Id.* That circumstance was "insufficient to trigger Title IX coverage." *Id.*

The decision in *NCAA* is controlling here. Just as the NCAA members paid private money to that organization, First Carolina Bank paid private money to CFA. CFA did not receive any federal funds. In fact, during the relevant period of alleged conduct, neither did First Carolina Bank. The only "assistance" from SBA was its guaranty of the loan that First Carolina Bank extended—no federal funds were present at all.

In its order on reconsideration, the district court defended its holding on the basis that SBA ultimately "provided federal funds to First Carolina Bank on June 15, 2021, when the SBA forgave CFA's PPP loan." JA157. The court reasoned that "the disbursement's timing" should not "make[] a difference." JA157. But if that reasoning were correct—effectively, that money is fungible—the Supreme Court would have reached the opposite outcome in *NCAA*. The institutional members in that case received federal funds and paid dues to the NCAA; under the district court's reasoning, it should not have "ma[de] a difference" whether or not those members paid those same federal dollars to the NCAA. After all, with federal funds available to pay for other obligations, members had more funds available to pay their dues. The Supreme Court rejected that reasoning by relying on whether or not the federal funds had been "earmarked" for NCAA dues. Yes, money is fungible, but for a

13

"grant or loan" of money to qualify as "Federal financial assistance," it must consist of federal funds.

The district court confused the presence of an intermediary with the presence of federal funds when it held that "[a]n entity is a recipient of federal financial assistance regardless of whether it receives the federal financial assistance directly or indirectly."  JA132.  To be sure, federal funds granted or loaned through an intermediary can qualify as "federal financial assistance," and the decisions cited by the district court support that proposition.  JA132, JA134–135 (citing *Grove City College v. Bell*, 465 U.S. 555 (1984); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022)).  But the directness or indirectness of a grant or loan is beside the point: the courts in those cases held that Title IX applied because the grants or loans at issue had been made with federal funds.  *See Grove City*, 465 U.S. at 569–70 ("[W]e have little trouble concluding that Title IX coverage is not foreclosed because ***federal funds*** are granted to Grove City's students rather than directly to one of the College's educational programs." (emphasis added)); *Peltier*, 37 F.4th at 127 ("RBA, as a recipient of ***federal funds*** through an intermediary, is subject to the requirements of Title IX." (emphasis added)).  The First Circuit likewise described these "Supreme Court cases [including *NCAA* and *Grove City*] as establishing that the term 'Federal financial assistance' generally refers to entities receiving ***federal funds***—directly or indirectly—so long as they are the intended recipients of the

14

federal legislation providing the assistance." *United States v. Hersom*, 588 F.3d 60, 65 (1st Cir. 2009) (emphasis added).

Neither the district court nor the Karaniks have cited—and CFA has not found—any case endorsing the applicability of Title IX to an entity which received a private loan. Rather, case law says just the opposite.

B.    SBA Regulations Demonstrate that a "Grant or Loan of Federal Financial Assistance" Must Consist of Federal Funds, Not Private Funds

The SBA's definition of "Federal financial assistance" as, among other things, a "grant or loan of Federal financial assistance"—while unhelpful in that the defined term appears in its own definition—refers to grants or loans of federal funds. *See* 13 C.F.R. § 113.105. The structure of SBA regulations defining "Federal financial assistance" demonstrates that this is so.

SBA's full definition of "Federal financial assistance" sets out five distinct categories, with the fifth functioning as a limited catchall:

(1) A grant or loan of Federal financial assistance . . . .

(2) A grant of Federal real or personal property or any interest therein . . . .

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

15

> (5) Any other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

*Id.* When one compares the description in subsection (1) to the descriptions in subsections (2) through (5), one can see that subsection (1) refers to the most basic form of financial assistance—funds extended by the federal government through a "grant or loan"—and the other subsections expand the definition beyond a simple transfer of federal funds. Subsections (2) and (4) add in grants, sales, or leases of federal property; subsection (3) adds in services; and the first part of subsection (5) adds in "other contract[s], agreement[s], or arrangement[s]." Expanding subsection (1) to include other arrangements and agreements, as the district court did, would swallow the other sections.[4]

This structure is even clearer in the regulations enforcing Title VI of the Civil Rights Act of 1964. Those regulations are useful here because, as this Court has instructed, "Congress intended that Title IX be interpreted and enforced in the same manner as Title VI." *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d

---

[4] In its order denying reconsideration, the district court dismissed any concern about "overlap" between subsections (1) and (5) as "not surprising" because subsection (5) is written as such a "broad catch-all provision." JA158. But the issue with the court's interpretation is not that subsection (5) is operating as a catch-all provision— statutory and regulatory lists very often end with such an item. The issue is that **subsection (1)** is operating as a catch-all provision. Statutory and regulatory lists do not typically *begin* in that way, and certainly not where the final item in the list starts with the words, "Any other."

203, 206 n.2 (4th Cir. 1994) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 (1979)).  Both Title VI and Title IX prohibit discrimination in programs that receive "Federal financial assistance," and both statutes authorize enforcement only by agencies that are "empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty."  *Compare* 42 U.S.C. §§ 2000d, 2000d-1, *with* 20 U.S.C. §§ 1681(a), 1682.

SBA regulations enforcing Title VI list five forms of assistance similar to those listed in SBA regulations enforcing Title IX.  But unlike SBA's self-referential definition in subsection (1) under Title IX, the first definition in these Title VI regulations is "grants and loans of Federal *funds*."   13 C.F.R. § 112.2(b)(1) (emphasis added).  The remaining subsections proceed to expand on that definition in the same way that subsections (2) through (5) do for subsection (1) of SBA's Title IX regulations.[5]  Thus, SBA regulations enforcing Title VI make clear that the first and most natural way to extend "federal financial assistance" to any program is to provide it with federal funds.  The best reading of "grant or loan of Federal financial

---

[5] These Title VI regulations differ from Title IX regulations in that the fifth item in the list does not expressly exempt a "contract of insurance or guaranty."  13 C.F.R. § 112.2(b) ("The term Federal financial assistance includes . . . any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.").  However, that exemption is made express elsewhere in the Title VI regulations.  13 C.F.R. § 112.2(c) ("This part does not apply to financial assistance extended by way of insurance or guarantee.").

assistance" under Title IX regulations should likewise limit the definition to grants or loans of federal funds.

In holding that CFA received a "grant or loan of Federal financial assistance" when the federal government's involvement was limited to a contract of guaranty—which contracts are expressly *excluded* from the definition of "Federal financial assistance"—the district court interpreted one part of the definition of "Federal financial assistance" to be broader than the defined term itself. JA133. That result is illogical and has no support in case law.[6]

### C.  Loans Guaranteed by SBA Under the PPP Are Not Made with Federal Funds and So Cannot Constitute "Federal Financial Assistance"

The loan that CFA received did not consist of federal funds. JA135 (stating that "PPP's structure" consists of "private lenders making loans to borrowers with a guaranty from the SBA"). It was not a "grant or loan of Federal financial assistance."

The district court held otherwise by reasoning that private loans guaranteed under the PPP are "Federal" in some abstract, undefined sense. JA133–135. The

---

[6] In its order denying reconsideration, the district court argued that, "[b]ecause the SBA typically loans funds through a deferred participation model, its definition of 'federal financial assistance' as 'a grant or loan of Federal financial assistance' would be meaningless if it never applied to the SBA's primary loan programs." JA157. To be sure, an interpretation of the regulatory text that "never" applied would be highly suspect. But the district court itself acknowledged that the SBA "typically," not exclusively, administers its loan programs through guaranties. *See, e.g.*, 13 C.F.R. § 123.5(a) ("SBA makes [physical disaster] loans directly or in participation with a financial institution."). An interpretation of text that would not "typically" apply is different from an interpretation that "never" would.

district court cited such factors as the presence of SBA's logo on First Carolina Bank's note, the loan agreement's reference to the CARES Act and PPP, and First Carolina Bank and CFA's execution of an SBA Form 1050 after the funds were disbursed. JA134.[7] Most important to the district court was the fact that, under the CARES Act, the private lender is "deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans." JA134–135 (quoting 15 U.S.C. § 636(a)(36)(F)(ii)(I)); JA156.

No statute, regulation, or judicial decision supports the district court's reasoning that a certain level of SBA involvement in the loan process—how much exactly, the court never said—could make the "financial assistance," a private loan, sufficiently "Federal." Such a rule would be unworkable. Does the "Federal" nature of "financial assistance" depend on what content a private lender chooses to include in its "loan documents" (*see* JA135)? If CFA had obtained its loan from a different

---

[7] The district court did not reach the Karaniks' argument that their "Title IX claims c[ould] proceed because CFA agreed in its loan application to follow Title IX and the SBA's regulations implementing Title IX." JA138 n.3; *see also* JA120. The court stated that it "need not address [this] weaker alternative argument" and cited North Carolina's "general rule . . . that one who is not a party to a contract may not maintain an action for its breach." JA138 n.3. The district court was correct in implying that the Karaniks would have no standing to enforce CFA's contract with First Carolina Bank—whether or not it obligated CFA to comply with SBA's regulations—because they were, at best, "incidental beneficiaries" of a contract for a loan to pay payroll expenses. JA138 (citing *Matternes v. City of Winston-Salem*, 286 N.C. 1, 15, 209 S.E.2d 481, 489 (1974)). In any event, even if this alternative argument were correct, it would only support a breach of contract claim, not a claim brought under Title IX itself.

bank that used different documents, could that assistance have been insufficiently "Federal"?

SBA's close involvement in the application process, which the district court found so significant, is more simply explained as the rational behavior of a prospective guarantor. SBA's actions amount to no more than vetting borrowers and ensuring that borrowers would use the loan funds for appropriate purposes. This is normal behavior for one assessing the risk of default before agreeing to guarantee a loan. *Cf. Verex Assur., Inc. v. John Hanson Sav. & Loan, Inc.*, 816 F.2d 1296, 1302 (9th Cir. 1987) ("In evaluating the risk of insuring a loan, the mortgage guaranty insurer considers . . . the borrower's credit and cash equity to determine likelihood of repayment . . . ."). *See generally Grojean v. Comm'r of Internal Rev.*, 248 F.3d 572, 573 (7th Cir. 2001) (Posner, J.) ("[W]hen the [loan] amount is the same, the lender and guarantor assume the same risk . . . ."). The district court went too far in finding that the SBA's involvement in the loan process was unusual and thereby converted the private loan into a "loan of Federal financial assistance."

The district court also placed undue emphasis on Congress's delegation of authority to private lenders to "make and approve" the loans. JA134–135 (citing 15 U.S.C. § 636(a)(36)(F)(ii)(I)); JA156 (same). That delegation was not meant to convert a private loan into "Federal financial assistance." Rather, as SBA itself recognized in its interim final rules implementing the PPP, the purpose of delegation

was to speed things along: "[t]he intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by *giving all lenders delegated authority* and streamlining the requirements of the regular 7(a) loan program."  SBA, Business Loan Program Temporary Changes; Paycheck Protection Program, 85 FR 20811-01 (Apr. 15, 2020) (emphasis added); *accord* SBA, Business Loan Program Temporary Changes; Paycheck Protection Program—SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 FR 33010-01 (June 1, 2020).  In any event, although these lenders may have had authority to make loans that the SBA then *guaranteed*, they did not have authority to make loans *for* the SBA.  This reality is most clear where a borrower used the funds for improper purposes and did not quality for forgiveness: "if the loans are not used for statutorily authorized purposes . . . the loans must be repaid in full **to the private lender**."  *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 424 (2d Cir. 2022) (emphasis added) (citing Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,814 (SBA Apr. 15, 2020)).  That these loans were repaid to the private lender—the entity that actually supplied the funds—demonstrates that the delegation of SBA authority was insufficient to convert the loans into "loans of Federal financial assistance."

The district court further erred by relying on two decisions for the proposition that the PPP program is a "loan program."  JA133–134 (citing *Springfield Hospital*,

28 F.4th 403; *Tradeways, Ltd. v. United States Dep't of the Treasury*, No. CV ELH-20-1324, 2020 WL 3447767 (D. Md. June 24, 2020)). To be sure, the courts in *Springfield* and *Tradeways* described the PPP program as a "loan program," but they only did so in the context of determining whether or not such loans are "grants" for bankruptcy law purposes—both courts found that they were not. *Springfield*, 28 F.4th at 425 ("Where Congress has deliberately designed what is plainly a loan program under the CARES Act, we cannot controvert its clear intent and re-classify the PPP as a 'grant' program for purposes of Section 525(a)."); *Tradeways*, 2020 WL 3447767, at *17 ("[T]he $659 billion disbursed to borrowers through the PPP are loans, not grants.").

More relevant here, however, is that both courts, after reviewing the statutory text, more precisely described the PPP program as one that *guarantees* loans. *See Springfield*, 28 F.4th at 423 ("[T]he substance of the PPP conclusively demonstrates that it is, as described, a loan guaranty program, not a grant program."); *Tradeways*, 2020 WL 3447767, at *17 ("[T]he CARES Act authorizes the Administrator to 'guarantee covered loans' issued pursuant to the PPP."). Neither court suggested, or even considered whether, such guaranties would qualify as "grants or loans of federal financial assistance."

**III.    The Loan to CFA Cannot Be, for Title IX Purposes, the Result of an Arrangement Which Had as One of Its Purposes the Provision of Assistance to Any Education Program or Activity Because the "Arrangement" Was a Contract of Guaranty**

The district court erred in reasoning that "PPP's structure—i.e., private lenders making loans to borrowers with a guaranty from the SBA" qualified under SBA's definition of "Federal financial assistance" as an "'arrangement which has as one of its purposes the provision of assistance to any education program or activity.'" JA135; 13 C.F.R. § 113.105.  The regulation immediately proceeds to exclude the "arrangement" of "a contract of insurance or *guaranty*."  13 C.F.R. § 113.105 (emphasis added).[8]  Indeed, the district court acknowledged that the law expressly exempts such contracts.  JA133.[9]

**A.    The District Court's Holding Would Write the "Contract of Guaranty" Exception Out of the Law**

The district court's interpretation of Title IX violated a "cardinal principle of statutory construction" because it would write the "contract . . . of guaranty"

---

[8] *See also* DOJ Title IX Manual § III.A.3 ("Title IX specifically states that it does not apply to contracts of insurance or guaranty.").

[9] That express exemption, combined with the fact that "recipients of PPP loans receive federal funds from third parties rather than directly from the government," led the Congressional Research Service to question as early as May 2020 "the precise reach of [Title IX and other] statutory and regulatory civil rights requirements for entities that receive PPP loans."  Cong. Research Serv., Applicability of Federal Civil Rights Laws to Recipients of CARES Act Loans 2–3 (May 1, 2020), https://crsreports.congress.gov/product/pdf/LSB/LSB10459.

exception out of the law. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotations omitted)); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624, 1630 (2018) ("[T]he canon against reading conflicts into statutes is a traditional tool of statutory construction.").

The only potential defendants in a Title IX suit are operators of "education program[s] or activit[ies]." *See* 20 U.S.C. § 1681. But those operators are in the business of *educating*, not making loans, so they have no need to enter into contracts of guaranty—whether federally provided or not. On the other hand, lenders *are* in the business of making loans and routinely need to enter into contracts of guaranty, but they do not operate education programs or activities, and so are not potential Title IX defendants. This distinction means that the guaranty "arrangement" that the district court found so significant here is, in fact, the *only* arrangement one would expect to see in a Title IX action: a lender entering into a contract of guaranty, and the operator of an education program or activity borrowing the funds. If the district court's definition of "federal financial assistance" were the rule, then the "contract . . . of guaranty" exception **would never apply** because lenders do not need it—they do not operate education programs or activities—and operators borrowing the funds

would not qualify for it—the contract "is between the lender and the SBA" (JA136).[10]

The situation is different under, for example, Title VI. That Title resembles Title IX in that it prohibits discrimination (albeit on the basis of race, color, or national origin) by receivers of "Federal financial assistance" while exempting any "contract of insurance or guaranty." 42 U.S.C. §§ 2000d, 2000d-1. But unlike Title IX, Title VI applies to "***any*** program or activity"—not just "any ***education*** program or activity"—"receiving Federal financial assistance." *Compare* 42 U.S.C. § 2000d, *with* 20 U.S.C. § 1681. Because the scope of Title VI omits the qualifier "education" in referring to "any program or activity," lenders are potential defendants for Title VI claims.[11] These lenders could avoid potential Title VI liability in cases where the

---

[10] In its order denying reconsideration, the district court sidestepped this point by stating, "To the extent an education institution becomes a party to a contract of guaranty, the exception would still apply." JA160. But this just assumes the court's conclusion. CFA's point, which the district court did not refute, is that an education institution will ***never*** become a party to a contract of guaranty.

[11] The same is true of the Rehabilitation Act of 1973, which likewise applies to "any program or activity receiving Federal financial assistance" (although the courts are split about whether the Act exempts a "contract of insurance or guaranty," *see* JA137). 29 U.S.C. § 794. As the district court observed about *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275 (6th Cir. 1996), and *Moore v. Sun Bank of N. Florida, N.A.*, 923 F.2d 1423 (11th Cir. 1991), "both cases involved whether the *lender* had received federal financial assistance that would expose it to liability for disability discrimination under the Rehabilitation Act." JA137 (emphasis in original). These lenders would never have been the subject of a Title IX claim because they do not operate an "education" program or activity.

only "federal financial assistance" they received was a "contract of guaranty." *See,*

*e.g.*, *Marshall v. Webster Bank, N.A.*, No. 3:10-CV-908 JCH, 2011 WL 219693, at

*7 (D. Conn. Jan. 21, 2011) (dismissing Title VI claim and rejecting plaintiff's

theory that the defendant-bank "receive[d] federal financial assistance in the form of

deposit insurance from the FDIC" because, "[a]ssuming that FDIC deposit insurance

is federal financial assistance, it is federal assistance in the form of a guaranty or

contract for insurance").[12]  Not so with Title IX.

### B. The District Court Erred in Relying on Whether CFA was "Congress's Intended Recipient"

The district court held that loans guaranteed under the PPP qualify as "Federal

financial assistance" because the "borrowers are Congress's intended recipients,"

and "the private lender is the intermediary."   JA135.   The problem with this

reasoning is that, whenever Congress authorizes a federal contract of guaranty, the

intended beneficiary will always be the borrower.  A guarantee is not an end in itself,

but a means to an end: "the guaranty enables funds to be supplied to the borrower."

*Grojean*, 248 F.3d at 573.

---

[12] Although the contrast between the texts of Title IX and of Title VI conclusively demonstrates that the borrower of a loan guaranteed by SBA *cannot* be subject to Title IX liability, CFA does not mean to argue that—and the Court need not reach whether—such a borrower would be subject to Title VI liability.  If anything, the reach of Title VI should be similarly limited since that Title also excludes "financial assistance extended by way of insurance or guarantee."   13 C.F.R. § 112.2(c). Neither the Karaniks nor the district court have cited any authority for Title VI liability in such circumstances.

The district court drew its test regarding "Congress's intended recipients" from case law holding that "federal financial assistance" can be extended through an intermediary.  JA135 (citing *NCAA*, 525 U.S. at 468; *U.S. DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986); *Grove City*, 465 at 564; *Peltier*, 37 F.4th at 127).  None of the cited decisions support the district court's holding.  *Grove City* and *Peltier* are the same decisions in which, as explained *supra* at 14–15, the "financial assistance" consisted of federal, not private, funds.  The Supreme Court in *NCAA* held that Title IX was ***not*** applicable since "there [wa]s no allegation that NCAA members paid their dues with federal funds earmarked for that purpose." 525 U.S. at 468.  The decision in *Paralyzed Veterans of America*, which dealt with the Rehabilitation Act, likewise shows the district court's error.  The Supreme Court held that the Act was inapplicable to commercial airlines because they had not received "federal financial assistance."  477 U.S. at 606–07.  The basis for this holding was that—as is the case for CFA—"[n]ot a single penny of [federal] money [wa]s given to the airlines." *Id.* at 605.

These decisions control on the issue of whether CFA received "Federal financial assistance" here.  The only potential "Federal financial assistance" extended in this "arrangement" would have been SBA's, *i.e.*, the ***federal*** agency's, contract of guaranty with First Carolina Bank.  The district court and all parties agree that Title IX expressly exempted that transaction from the definition of "Federal

financial assistance."  But if that is so, it cannot be the case that "Federal financial assistance" materialized in the ***subsequent*** transaction—one step ***removed*** from the federal agency—when First Carolina Bank loaned private funds to CFA.[13]  The absence of federal funds is dispositive.

Although the district court described CFA as one of "Congress's intended recipients," the district court did not say, because it could not say, that Congress specifically considered and addressed whether loan guaranties under the PPP would qualify as "Federal financial assistance."  Neither the text nor legislative history of the CARES Act contains any mention of that term or Title IX.  To the contrary, when Congress considered the topic of assistance for education programs—and corresponding program obligations for recipients—it instead created relief funds for elementary and secondary schools and for institutions of higher education.  Pub. L. 116-136, 134 Stat. 565–68 (Mar. 27, 2020).  Congress specifically addressed the

---

[13] In its order denying reconsideration, the district court wrote, "according to CFA, the court should have understood the loan from First Carolina Bank to CFA and the contract of guaranty between the SBA and First Carolina bank as a single unit existing outside Title IX's reach."  JA159.  That is not a correct description of CFA's argument.  To the contrary, CFA contends that these two transactions were *not* a "single unit."  The SBA's contract of guaranty was one transaction—in which a federal agency provided financial assistance but in a form that is expressly excluded from the definition of "Federal financial assistance" under Title IX—and First Carolina Bank's loan to CFA was another transaction—in which SBA provided no "assistance" at all.  It is the district court that treats these transactions as a "single unit" by erroneously holding that they constitute an "arrangement" of federal financial assistance.

eligibility of non-public schools to benefit from these funds and mandated that recipients "provide equitable services" under the Elementary and Secondary Education Act of 1965. *Id.*, 134 Stat. 568. On the other hand, when it came to the PPP, Congress's title for the Act indicates that its focus was "Keeping American Workers Paid and Employed." *Id.*, tit. I, 134 Stat. 286; *see also Springfield*, 28 F.4th at 409 ("PPP . . . [was] targeted at providing small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed.").

The district court's response to all of this, as articulated in its order denying reconsideration, is that,

> even if CFA's argument has merit, CFA's reasoning leads to an anomalous conclusion—namely, that a private education institution can skirt federal nondiscrimination law by only receiving federal assistance through loans structured similarly to the PPP and then using the lender's contract of guaranty as legal cover. The statutory text and the structure of the arrangement Congress created in the PPP does not command that result.

JA160. But this misses the point. The text of Title IX and SBA's regulations *do* command that result. What the district court calls "anomalous" is, in fact, the result of a policy decision that Congress and SBA made: where the only form of assistance that the federal government offers to a private school is a contract of guaranty, Title IX does not apply. "Courts are not authorized to rewrite a statute because they might

deem its effects susceptible of improvement." *Schafer v. Astrue*, 641 F.3d 49, 61

(4th Cir. 2011) (quoting *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984)).

## IV. The Court Should Vacate the District Court's Order as to the Karaniks' Breach of Contract Claims and Remand for Further Consideration

The district court denied CFA's motion to dismiss the Karaniks' state law

breach of contract claims.    JA150–153.    However, in certifying the Order for

interlocutory appeal, the district court wrote,

> If the court's determination that receiving a PPP loan subjects the
> borrower to Title IX for the life of the loan is incorrect, then CFA would
> be entitled to judgment as a matter of law on all of plaintiffs' Title IX
> claims.    Only Elizabeth Karanik's and Charlotte Karanik's state-law
> breach of contract claims would remain, and ***the court would likely
> decline to continue exercising supplemental jurisdiction over those
> claims***.

JA163 (emphasis added).    If this Court reverses the Order as to the Karaniks' Title

IX claims, then it should vacate the Order as to their state law breach of contract

claims and remand to the district court.[14]    *See E.E.O.C. v. Seafarers Int'l Union*, 394

F.3d 197, 200 (4th Cir. 2005) ("When a circuit court certifies an interlocutory appeal

under § 1292(b), it assumes jurisdiction of the certified order, not merely the

controlling issue of law on which certification was granted.").

---

[14] No party has appealed the district court's dismissal of the Karaniks' state law
claims for intentional infliction of emotional distress and negligent infliction of
emotional distress.    JA147–150.    The Court need not review that part of the Order.

## CONCLUSION

The Court should reverse the Order in part, as to the Karaniks' Title IX claims; vacate in part, as to their state-law breach of contract claims; and remand to the district court.

## REQUEST FOR ORAL ARGUMENT

CFA respectfully requests oral argument because the issue on appeal is one of first impression for this or any other United States Court of Appeal.

This, the 23rd day of January 2023.

Respectfully submitted,

CRANFILL SUMNER LLP

*/s/ Patrick M. Mincey*
PATRICK M. MINCEY
N.C. Bar No. 38372
STEPHEN J. BELL
N.C. Bar No. 44211
VINCE EISINGER
N.C. Bar No. 57646
101 N. 3rd Street, Suite 400
Wilmington, NC 28401
Telephone: (910) 777-6000
Facsimile: (910) 777-6111
E-mail:  pmincey@cshlaw.com
         sbell@cshlaw.com
         veisinger@cshlaw.com

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains 7,794 words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.

This, the 23rd day of January 2023.

Respectfully submitted,

CRANFILL SUMNER LLP

*/s/ Patrick M. Mincey*
PATRICK M. MINCEY
N.C. Bar No. 38372
STEPHEN J. BELL
N.C. Bar No. 44211
VINCE EISINGER
N.C. Bar No. 57646
101 N. 3rd Street, Suite 400
Wilmington, NC 28401
Telephone: (910) 777-6000
Facsimile: (910) 777-6111
E-mail:  pmincey@cshlaw.com
         sbell@cshlaw.com
         veisinger@cshlaw.com

*Counsel for Defendant-Appellant*