**CASE NO. 22-2221**

# IN THE
# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤
## FOR THE FOURTH CIRCUIT

---

ELIZABETH KARANIK;
CHARLOTTE KARANIK, by her parents and next friends;
JOHN KARANIK; KIMBERLY KARANIK; NATALIE PRESSLEY,

*Plantiffs - Appellees,*

v.

CAPE FEAR ACADEMY, INC.,

*Defendant - Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON

---

**RESPONSE BRIEF OF APPELLEES**

---

Gary K. Shipman
James T. Moore
Thomas R. Harvey III
SHIPMAN & WRIGHT, LLP
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
910-762-1990
gshipman@shipmanlaw.com
jmoore@shipmanlaw.com
tharvey@shipmanlaw.com

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-2221__        Caption: __Elizabeth Karanik, et al. v Cape Fear Academy, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Elizabeth Karanik__
(name of party/amicus)

_____

 who is _____Plaintiff/Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?               ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Gary K. Shipman                     Date:        12/05/2022

Counsel for:  Plaintiffs-Appellees

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-2221        Caption: Elizabeth Karanik, et al. v Cape Fear Academy, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Charlotte Karanik, by her parents and next friends John Karanik and Kimberly Karanik
(name of party/amicus)

who is _____Plaintiff/Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?   ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gary K. Shipman      Date: 12/05/2022

Counsel for: Plaintiffs-Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-2221__     Caption: __Elizabeth Karanik, et al. v Cape Fear Academy, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Natalie Pressley__
(name of party/amicus)

_____

 who is _____Plaintiff/Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.     Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gary K. Shipman                          Date:    12/05/2022

Counsel for: Plaintiffs-Appellees

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

    I.     STATEMENT OF JURISDICTION .........................................................1

    II.    QUESTION PRESENTED......................................................................1

    III.   STATEMENT OF THE CASE ................................................................1

    IV.   SUMMARY OF THE ARGUMENT.......................................................12

    V.    ARGUMENT.........................................................................................15

    I.     STANDARD OF REVIEW ....................................................................15

    II.    CFA RECEIVED "FEDERAL FINANCIAL ASSISTANCE,"
         WHICH SUBJECTS IT TO CLAIMS UNDER TITLE IX....................16

         A. CFA's PPP Loan constitutes Federal financial assistance
            regardless of First Carolina Bank's status as a private lender,
            thereby subjecting CFA to Title IX claims .........................................23

         B. CFA's PPP Loan was not a contract of guaranty, and
            accordingly, CFA is not excluded from Title IX claims....................31

    III.   THIS COURT SHOULD NOT VACATE THE DISTRICT
         COURT'S ORDER REGARDING APPELLEES' BREACH OF
         CONTRACT CLAIMS ..........................................................................41

CONCLUSION......................................................................................44

CERTIFICATE OF COMPLIANCE.......................................................45

# TABLE OF AUTHORITIES

## Cases

*Albino Constr. Co. v. Wells Fargo Bank, N.A.*,
  CIVIL ACTION NO. 21-35, 2021 WL 2529811 (E.D. Pa. June 17, 2021) ..... 21

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ......................... 15, 16

*Awah v. Mansfield Kaseman Health Clinic*,
  2021 WL 6197415 (D. Md. Dec. 30, 2021) ...................................................... 40

*Butler v. Capitol Fed. Sav.*,
  904 F. Supp. 1230 (D. Kan. 1995) ............................................................ 35, 36

*Duke v. Reconstruction Fin. Corp.*,
  209 F.2d 204 (4th Cir. 1954) ........................................................................ 38

*E.H. by and through Herrera v. Valley Christian Acad.*,
  No. 221CV07574MEMFGJSX, 2022 WL 2953681
  (C.D. Cal. July 25, 2022) ............................................................................ 40

*Fannin v. CSX Transp., Inc.*,
  No. 88–8120, 1989 WL 42583 (4th Cir. Apr. 26, 1989) ............................ 41-42

*Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir.), amended, 777 F.2d 329 (5th Cir. 1985) ............ 26, 27

*Gallagher v. Croghan Colonial Bank*,
  89 F.3d 275 (6th Cir. 1996) .......................................................................... 37

*Graves v. Methodist Youth Servs., Inc.*,
  624 F. Supp. 429 (N.D. Ill. 1985) ............................................................ 27, 28

*Grout Doctor Glob. Franchise Corp. v. Groutman, Inc.*,
  No. 7:14-CV-105-BO, 2015 WL 2353698 (E.D.N.C. May 14, 2015) ............. 34

*Grove City Coll. v. Bell*,
  465 U.S. 555, 104 S. Ct. 1211, 79 L. Ed. 2d 516 (1984) ...................... 20, 26, 32

*Hall v. DIRECTV, LLC*,
  846 F.3d 757 (4th Cir. 2017) ........................................................................ 16

ii

*Hamilton v. Illinois Cent. R.R. Co.*,
    894 F. Supp. 1014 (S.D. Miss. 1995) ................................................ 37

*Husbands v. Financial Management Solutions, LLC*,
    No. GJH-20-3618, 2021 WL 4339436 (D. Md. Sept. 23, 2021) ............... 40-41

*In re Gateway Radiology Consultants, P.A.*,
    983 F.3d 1239 (11th Cir. 2020) ........................................... 16, 17, 32

*Marshall v. Webster Bank, N.A.*,
    No. 3:10-CV-908 JCH, 2011 WL 219693 (D. Conn. Jan. 20, 2011) .............. 36

*Miller v. Bolger*,
    802 F.2d 660 (3d Cir. 1986) ................................................. 42

*Moore v. Sun Bank of N. Florida., N.A.*,
    923 F.2d 1423 (11th Cir. 1991) .............................................. 38

*NCAA v. Smith*,
    525 U.S. 459 (1999) .................................................. 24, 29, 32

*Peltier v. Charter Day School, Inc.*,
    No. 20-1001, 2022 WL 2128579 (4th Cir. June 14, 2022) ................... 24, 32

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
    990 F.3d 217 (2d Cir. 2021) ................................................. 17

*Sheppard v. Visitors of Va. State Univ.*,
    993 F.3d 230 (4th Cir. 2021) ................................................ 15

*Small Bus. Admin. v. McClellan*,
    364 U.S. 446 (1960) ........................................................ 16

*Springfield Hosp., Inc. v. Guzman*,
    28 F.4th 403 (2d Cir. 2022) ................................. 17, 18, 24, 35, 39

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000) ................................................ 34

*Tradeways, Ltd. v. United States Dep't of the Treasury*,
    No. ELH-20-1324, 2020 WL 3447767 (D. Md. June 24, 2020) ............... 24, 28

*U.S. DOT v. Paralyzed Veterans of Am.*,
    477 U.S. 597, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986) ................... 27, 32

iii

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
   848 F.3d 330 (4th Cir. 2017) ............................................................. 41

*United States v. Baylor Univ. Med. Ctr.*,
   736 F.2d 1039 (5th Cir. 1984) ......................................................... 35

*United States v. Kimbell Foods, Inc.*,
   440 U.S. 715, 99 S. Ct. 1448, 59 L. Ed. 2d 711 (1979) .............................. 16, 17

*United States v. Vahlco Corp.*,
   800 F.2d 462 (5th Cir. 1986) ........................................................... 34

*Weissman v. Sinorm Deli, Inc.*,
   88 N.Y.2d 437, 646 N.Y.S.2d 308, 669 N.E.2d 242 (1996) ........................... 34

## Statutes

11 U.S.C. § 525 ............................................................................ 39

15 U.S.C. § 631 ........................................................................ 16, 18

15 U.S.C. § 636 ......................................................... 14, 16, 17, 25, 34

15 U.S.C. § 9005 ...................................................................... 18, 35

15 U.S.C. § 9012 ........................................................................... 18

15 U.S.C.A. § 631 ......................................................................... 13

20 U.S.C. § 1681 ...................................................................... 19, 20

20 U.S.C. § 1687 ........................................................................... 20

20 U.S.C. §§ 1681 –1683, 1685 –1688 ............................................... 22

28 U.S.C. § 1292 .................................................... 1, 11, 12, 41, 42

28 U.S.C. § 1376 ........................................................................... 43

## Other Authorities

13 C.F.R. pt. 112, 113 and 117 ................................................. 13, 21, 23

13 C.F.R. § 113.100 ............................................................... 13, 18, 22

13 C.F.R. § 113.105 ......................................................... 13, 21, 31, 33, 36

13 C.F.R. § 113.115 ............................................................... 13, 19, 22

13 C.F.R. § 113.400 ................................................................... 19, 20

13 C.F.R. § 120.2 .......................................................................... 17

34 C.F.R. § 106.2 .......................................................................... 20

iv

*Black's Law Dictionary* (11th ed. 2019) .................................................. 33

Cong. Research Serv., LSB10459, p. 5, Applicability of Federal Civil
    Rights Laws to Recipients of CARES Act Loans 2 (May 1, 2020)............. 39-40

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),
    Pub. L. No. 116-136, 134 Stat. 281 (2020) ........................................17

Fed. R. App. P. 32.1 .................................................................. 42

Fed. R. Civ. P. 12 ...............................................................11, 15

https://www.sba.gov/funding-programs/grants .......................................18

https://www.sba.gov/sites/default/files/2020-04/SBA%20Faith-
Based%20FAQ%20Final.pdf...........................................................23

*Oxford English Dictionary* (online ed.) .............................................. 32

www.sba.gov/funding-programs/loans/covid-19-relief-options ...........................18

## I.    STATEMENT OF JURISDICTION

On November 29, 2022, the Court granted Appellant's petition under 28 U.S.C. § 1292(b) for interlocutory review of the district court's order denying Appellant's motion to dismiss Appellees' Title IX claims.

## II.    QUESTION PRESENTED

Is the Appellant the recipient of Federal financial assistance and therefore subject to liability under Title IX, when it voluntarily applied for and accepted a loan, which was later forgiven, under the Small Business Administration's ("SBA") Pay Check Protection Program ("PPP")?

## III.    STATEMENT OF THE CASE

Appellant, Cape Fear Academy, Inc. ("CFA") is a private, non-denominational school (K-12) located in Wilmington, North Carolina. JA12. During the 2020-21 academic year, Elizabeth Karanik ("Elizabeth") was a member of the senior class at CFA, and her sister, Charlotte Karanik ("Charlotte") was a sophomore, both in good academic and behavioral standing. JA18, JA58. The students attended CFA pursuant to an enrollment contract between CFA and the students' parents. JA22-23. During the 2020-2021 academic year, CFA applied for and received $1,253,949.00 in federal funding via a Paycheck Protection Program ("PPP") loan, authorized under the CARES Act, and administered by the SBA. JA12. CFA's PPP application provided that CFA would be receiving "financial

assistance," and CFA agreed that it would not discriminate based on categories cited in Title IX. JA14.

During the 2020-2021 school year, Natalie Pressley ("Natalie"), a sexual assault survivor and close friend of Elizabeth, was enrolled in an Advanced Placement ("AP") Literature course in which she was subjected to sexual harassment, unwelcome conduct and bullying, on the basis of her sex, by certain male students in her AP Literature class at CFA. JA27. Plaintiff's Amended Complaint details the nature of this conduct, the severe emotional distress it caused and Natalie's attempts to discuss these issues with CFA teachers and staff members. JA27-37. That included bringing her concerns to the attention of Tobi Ragon, CFA's counselor, who left Natalie with the impression that she had no authority to do anything about it. JA29-30.

Despite CFA's awareness, the conduct of the male students in Natalie's AP Literature class continued well into the Spring of 2021. JA32, JA35. During that semester, Natalie was reassigned into a new statistics class with some of the same male students involved in the AP Literature class harassment and unwelcome conduct. JA34. After again informing Ms. Ragon of her concerns and being mentally incapable of participating in the class, Natalie requested to be assigned to a different statistics class, which was denied by CFA. JA34. One of the expressed reasons for the denial was that accommodations for Natalie would only hurt her over time

because the "real world doesn't accommodate mental illness." JA34-35. After several days of attending the class and additional discussions with Ms. Ragon, Natalie was eventually permitted to attend the class online. JA35.

The last unit for the 2020-21 academic year in Natalie's AP Literature class was a series of short stories, one of which details the rape and murder of a 15-year-old girl. JA35. Natalie's teacher informed Natalie that she thought it was important that Natalie read the story and participate in class discussions. JA36. During those discussions, the male students again participated in inappropriate jokes and comments, including one male student commenting "women getting raped and murdered, what's wrong with that… tale as old as time," which was met with laughter from other male students. JA36-37. When Natalie attempted to engage in the discussions, one male student said "I don't think that any of us here would rape anyone," to which another male student responded "don't speak for all of us." JA37. This resulted in Natalie experiencing symptoms consistent with a panic attack, and her leaving the classroom. JA37. Natalie once again went to see Ms. Ragon to inform her of the hostile environment. JA37. Natalie felt no more protected than when she first reported the sexual harassment, unwelcome conduct and bullying to CFA. JA35.

Students at CFA began to learn of what happened to Natalie in her AP Literature class, including both Elizabeth and Charlotte. JA37. As a result of the abuse suffered by Natalie, and that other students experienced with the same male

3

students, including Elizabeth, the students raised concerns with CFA teachers and administrators. JA37-38.

Ms. Ragon had individual and group conversations with Elizabeth and other students about the experiences they had at CFA similar to those Natalie had experienced. JA37-38. Ms. Ragon again left the impression that because of her position, she had no authority to do anything and suggested they speak with CFA's Dean of Students, Jamison Fee. JA38. Over approximately a week, Elizabeth and other students shared with Mr. Fee the sexual harassment and unwelcome conduct which they had been subjected by these male students. JA38. Elizabeth then provided Mr. Fee with incidents involving these male students, via email, where she detailed the sexual harassment and unwelcome conduct she had been subjected while at CFA, including being called a "hoe", "slut" and being asked or encouraged to have sex with other CFA male students. JA39.

Despite students, including Natalie and Elizabeth, sharing the sexual harassment and unwelcome conduct they had been subjected to with administrators and counselors at CFA, CFA took no action against these male students. JA45. Instead, some of the male students who were the subject of the concerns raised by Natalie, Elizabeth and others were chosen to speak at CFA's 2021 commencement ceremony by CFA administration. JA40. After expressing their concerns and objections to these male students being selected speakers, CFA still took no action.

4

Accordingly, with the encouragement of members of CFA staff, who expressed that the "idea of a petition is smart", a group of twenty (20) students drafted a petition requesting that certain male students selected to speak at CFA's graduation be removed. JA41, JA42. Specifically, the petition provided:

> The senior class feels that those chosen to speak at graduation and commencement do not accurately represent the class of 2021. The senior class feels [ certain identified male students] do not deserve speaking roles in these events. The group feels these students have caused harm to fellow CFA students and would be setting a bad example for our school community. The class feels the speakers chosen for these events should be people who care about their fellow peers and be people who support their classmates. The class would like to remove their speaking roles and replace them with either elected peers or teachers. We ask that they be removed from these roles or step down from them knowing their classmates will not respect their speeches due to their own lack of respect in the CFA community.

JA42. Elizabeth then posted this petition to change.org, where it garnered 27 signatures, including Elizabeth and Charlotte, before it was removed at the behest of CFA administration. JA42-43. Elizabeth and Charlotte allege that the complaints to CFA regarding the sexual discrimination and/or harassment, and the drafting, posting, and signing of the petition was protected activity under Title IX. JA18, JA20, JA44.

Shortly after the petition was taken down, Elizabeth was summoned to meet with CFA administration as they "investigated" the petition. JA43. Elizabeth was informed by Mr. Fee that because she was the person that uploaded the Petition, she was "going have to take the 'rap' for it." JA44. Elizabeth was informed that others

should "share the pain" of posting the petition, and that the posting of the Petition had become a "social thing that's reckless endangerment, false accusations, whenever you put someone's name out in the public, that's bad." JA44, JA45. However, Elizabeth refused to provide a list of names of those who had collaborated in writing the Petition. JA44. Natalie and other students attempted to meet with Mr. Fee about the Petition, but he refused to meet with them. JA45-46.

On May 15, 2021, Elizabeth's mother was informed that Elizabeth would be brought before CFA's Honor Council "in relation to…posting the petition on a social site with the names of the students included" for a "major infraction" of "publish[ing] material intended to harm," namely "retaliating, intimidation, threats, reprisal, false accusations. JA46. CFA excluded Elizabeth's parents from attending the Honor Council proceeding, even though CFA had communicated exclusively with them, and not Elizabeth, about the proceeding. JA46-47, JA50. However, CFA administration assured Elizabeth and her parents, Kim and John Karanik, that even if Elizabeth were to be suspended, nothing in the handbook provided for her to be excluded from commencement activities. JA46. Elizabeth's parents were later informed that the "appropriate disciplinary violation under the major infraction in the Handbook is 'who publishes material intended to harm or slander another person.'" JA47.

6

By May 18, 2021, the date Elizabeth was scheduled to appear before CFA's Honor Council, she was emotionally distraught. JA49. Elizabeth had suffered from a number of medical conditions during her tenure at CFA, and those at CFA were well aware of that. JA49. Elizabeth is both tachycardic and orthostatic, and because of the stress brought on by the actions, or inactions, of those at CFA, Elizabeth was too ill to attend school in the several days leading up to May 18, 2021. JA49.

The morning of May 18, 2021, Kim Karanik measured her daughter's heart rate at 139, for which she was obviously concerned. Mrs. Karanik therefore walked into CFA to check on her daughter prior to the Honor Council hearing, but was told by CFA's counselor, Ms. Ragon, to leave, and Mrs. Karanik obliged. JA50. Accompanied by Ms. Ragon, the CFA Counselor who encouraged Elizabeth, Natalie, and the other female students to post the Petition, Elizabeth appeared before CFA's Honor Council made up of CFA's students, with certain CFA staff and administrators also in attendance. JA50.

During her presentation, Elizabeth read a letter to those present from her private counselor with whom she had been in therapy. JA50. That letter detailed the treatment that Elizabeth had been receiving "directly related to bullying and maltreatment by peers" at CFA. JA50. It also included Ms. Ragon's awareness (prior to the posting of the Petition) of Elizabeth and other CFA female students' concerns regarding "abuse and inappropriate student behaviors" of certain male students, and

that her therapist had encouraged Elizabeth to speak to CFA's Counselor, Ms. Ragon, to voice her concerns. JA50-51.

In this letter, Elizabeth's therapist confirmed that "speaking out" as a victim of sexual abuse/assault/harassment" is so important to her overall mental health, and that her "mental and physical state" had deteriorated as a result of what she was experiencing with being brought before the Honor Council because of the Petition. JA51. The letter made clear that in the counselor's "professional opinion, Elizabeth and others are at risk of being revictimized by a school system that has made it clear that insensitive and inappropriate behavior is acceptable thus further creating a culture that protects those who abuse and silent victims." JA51. After the presentation, Ms. Ragon informed the Honor Council that she did not believe Elizabeth should be punished. JA51. Ms. Ragon further emphasized that she could have given better direction about the Petition. JA51. After Elizabeth and Ms. Ragon left, upon information and belief, the student members of the Honor Council deliberated and determined Elizabeth's "culpability." JA51. Specifically, that no action should be taken against Elizabeth and that the male students who were the subject matter of Elizabeth, Natalie, and the other students' concerns should be disciplined. JA51-52. Upon information and belief, the Honor Council did not determine that Elizabeth violated the CFA Code of Conduct and therefore did not

8

consider the Consequence Guidelines and make its recommendations to the Dean of Students and Upper School Director on this issue. JA52.

On May 19, 2021, Mrs. Karanik received an email from CFA's Upper School Director, informing her that Elizabeth's:

> decision to publish the petition on a public platform, use the CFA logo without permission, and use the full names of CFA students was a poor one, and although Elizabeth may not fully understand the ramifications of her actions on the people she names, the petition may have unintended harmful consequences. In an effort to bring reconciliation between the members of the senior class, Elizabeth is required to write a note to each mentioned student apologizing for not understanding the ramifications of her actions and the potential harm she caused by 8:00 pm Sunday, May 23rd.

JA52. Elizabeth's parents were further notified that if Elizabeth refused to write a letter of apology, she would not be allowed to participate in commencement activities. JA55. Elizabeth, with the support of her parents, declined to write such an apology and was subsequently barred from participating in CFA class of 2021's Salute to Seniors and commencement activities. JA55. This was surprising to Elizabeth and her parents given Mr. Fee's representations that regardless of the Honor Council's decision, CFA would not exclude Elizabeth from the graduation activities. JA46, JA54. During the graduation ceremonies, CFA omitted any mention of Elizabeth, including the fact that she was a graduating student. JA56-57. Furthermore, CFA immediately suspended Elizabeth's email account. JA58.

In January of 2021, John and Kim Karanik signed an enrollment contract with CFA and paid the required one-half tuition deposit, which CFA accepted, for Charlotte to attend during the 2021-2022 academic year. JA58. Following the incident with the petition and the Karaniks' subsequent support for their daughter Elizabeth, and after the Karanik's paid the remainder of Charlotte's tuition (concurrent to Elizabeth's decision not to issue an unwarranted and unnecessary apology), and in further retaliation for both Elizabeth and Charlotte's protected activities, CFA canceled Charlotte's 2021-2022 enrollment contract on June 4, 2021, citing specifically her parents' support of her sister, Elizabeth. JA59. Specifically, the termination letter provided, in pertinent part that:

> the [e]nrollment [c]ontract may be terminated if [CFA] concludes in its sole discretion that the actions of a parent impede a constructive relationship or otherwise materially interfere with its accomplishment of its mission . . . [t]he culminating event relates to [Kim's] recent involvement with respect to matters related to your daughter [Elizabeth's] recent interaction with the Honor Council . . . [f]urther you failed to support and cooperate with the outcome of the school's disciplinary process, as evidenced by your support for [Elizabeth's] decision not to write apologies to any of the three students named in the on-line petition which co-opted the [CFA] logo.

JA59. CFA also suspended Charlotte's access to her email account. JA60.

On December 27, 2021, an Amended Complaint was filed alleging *inter alia* a Title IX discrimination claim as to Natalie, a Title IX retaliation claim as to Elizabeth, a Title IX retaliation claim on behalf of Charlotte, intentional and negligent infliction of emotional distress claims on behalf of Elizabeth and Charlotte,

breach of contract claims, and violations of the covenant of good faith and fair dealing on behalf of Elizabeth and Charlotte.[1] JA122, JA128. On January 10, 2022, CFA moved to dismiss the Amended Complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that its acceptance of a PPP loan was not sufficient to subject it to Title IX. JA91, JA122. Appellees responded in opposition to CFA's motion to dismiss on January 31, 2022. JA122. In an Order issued on June 17, 2022 (the "Order") the Honorable James C. Dever, United States District Judge, granted in part and denied in part CFA's motion to dismiss. JA122, JA142, JA146. The court denied CFA's motion to dismiss with respect to the Title IX claims holding that "a PPP loan is 'federal financial assistance' subject to Title IX…." JA132-146. The court also upheld Elizabeth and Charlotte's breach of contract claims. JA152-153. However, it dismissed the claims of intentional and negligent infliction of emotional distress *without prejudice*.[2] JA148, JA150.

On July 1, 2022, CFA moved the district court to reconsider its June 17, 2022, order or, in the alternative, amend the order certifying it for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). JA154. Appellees filed a Memorandum in

---

[1] The Title IX discrimination claim on behalf of Natalie was voluntarily dismissed on December 27, 2022. JA62-70.

[2] On January 26, 2023, Appellees moved for leave from the court to file a second amended complaint re-alleging intentional infliction of emotional distress claims on behalf of Elizabeth and Charlotte and *in the alternative* claims for negligence against CFA.

Opposition to Petitioner's Motion to reconsider on July 21, 2022, arguing that the district court did not err and that an interlocutory appeal is not appropriate. JA154. By order on October 31, 2022, Judge Dever denied CFA's motion for reconsideration, but certified the June 17, 2022, Order for interlocutory appeal on the issue of "whether a PPP loan constitutes federal financial assistance that subjects a borrower to Title IX.[3]" JA154, JA162, JA166. On November 9, 2022, CFA petitioned this Court under 28 U.S.C. § 1292(b) for interlocutory review of the district court's order. On November 29, 2022, this Court granted CFA's petition.

## IV.    SUMMARY OF THE ARGUMENT

CFA's unsubstantiated contention that the $1,253,949.00 it received from the PPP loan it obtained, which was forgiven, did not constitute "federal financial assistance" thereby subjecting CFA to the provisions of Title IX, consciously ignores the Small Business Administration's ("SBA") own Regulations (codified in the Code of Federal Regulations), the SBA's supporting materials, and CFA's own PPP loan application. Consequently, CFA goes to great lengths to deflect the reality of its decision to voluntarily apply for, accept and enjoy the benefits of forgiveness of a PPP loan, which unquestionably constitutes the receipt of Federal financial assistance, thereby subjecting CFA to Title IX claims.

---

[3] CFA did not challenge the district court's determination that [appellees] stated plausible Title IX student-on-student harassment and retaliation claims. JA162.

12

PPP loans are intended to be Federal financial assistance made pursuant to the "declared policy of Congress that the Government should aid, counsel, assist and protect, insofar as possible, the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation." 15 U.S.C.A. § 631(a). The SBA's regulatory definition of Federal financial assistance encompasses (1) "[a] grant or loan of Federal financial assistance" and (2) "[a]ny other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty." 13 C.F.R. § 113.105. Furthermore, the SBA has incorporated Title IX into its Regulations. *See* 13 C.F.R. § 113.100. The district court held that a PPP loan is "federal financial assistance" subject to Title IX based upon both of the above referenced categories. JA133, JA135, JA157-158.

In addition to the SBA's regulatory provisions, CFA's PPP loan application itself expressly provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice . . . on the basis of categories cited in 13 C.F.R., Parts 112, 113 and 117 of SBA Regulations." JA120. This same "assurance" is mandated by the SBA regulations (13 C.F.R. § 113.115), which CFA simply ignores.

CFA's attempts to utilize the terms "private lender" and "private loan" interchangeably does not change the fact that the PPP loan it received was a grant or

13

loan of Federal financial assistance. The case law is clear that an entity receives Federal financial assistance, whether directly or indirectly, when it is the intended recipient of the assistance. The SBA's use of an intermediary, in the form of a bank, does not break the link between the Federal financial assistance and the intended recipient. Here CFA, like other small businesses affected by Covid-19, was the government's intended recipient, not the lending institution. As such, it makes no difference that CFA received federal funds distributed by one of the SBA's private lending partners. CFA still received federal funds, and therefore, Federal financial assistance. Like other Section 7(a) loans, PPP loans are made through private lenders.

CFA next contends that despite Congress' use of the word loan to describe PPP no less than 75 times, and placing it within section (7)(a) of the Small Business Act, which governs loans issued by the SBA, that PPP was not in-fact a loan but instead a contract of guaranty. *See* 15 U.S.C. § 636(a). However, this argument doesn't stand up to scrutiny. CFA received much more than a guarantee; it received Federal funds through the PPP program, initially in the form of a "loan," but ultimately, when that loan was forgiven, Federal funds for which CFA will never be obligated to repay. In contrast to the PPP loan that CFA received, providing CFA with a direct infusion of federal funds to meet immediate needs, courts analyzing contracts of guaranty and insurance have looked to FDIC insurance and the Federal

14

Fair Housing Act, to point out that Congress' exemption of insurance and contracts of guaranty make sure that federal civil rights legislation does not impact every person or entity simply because they maintain a federally insured deposit account or obtained an FHA loan.

By contrast, CFA specifically applied for the PPP loan, and acknowledged that it would be required to abide by Federal Civil Rights legislation, including Title IX during the time the loan was active. At no point was there a "contract of guaranty" between the borrower, CFA, and the SBA. Instead, the CARES Act makes clear that CFA received a PPP loan that was completely forgiven by the SBA and was never conditioned upon CFA's failure to pay the debt.

As such this Court should AFFIRM the District Court's ruling.

## V.    ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews *de novo* dismissals under Rule 12(b)(6) for failure to state a claim, viewing the facts in the light most favorable to the plaintiff. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "The plausibility standard is not a probability requirement, but 'asks for more than

a sheer possibility that a defendant has acted unlawfully.'" *Hall v. DIRECTV, LLC,* 846 F.3d 757, 765 (4th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). "Although it is true that the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." *Id.* (internal quotation marks omitted).

## II. CFA RECEIVED "FEDERAL FINANCIAL ASSISTANCE," WHICH SUBJECTS IT TO CLAIMS UNDER TITLE IX.

Under Section 7(a) of the Small Business Act, Congress empowered the SBA to make loans to support small business. *See* 15 U.S.C. § 636(a); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960); *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247-48 (11th Cir. 2020). Section 7(a) of the Small Business Act, 15 U.S.C. § 631, *et. seq.* authorizes the SBA to "make loans to any qualified small business concerns . . . either directly or in cooperation with banks or other financial institutions[.]" 15 U.S.C. § 636. The 7(a) program is the SBA's primary program for providing *financial assistance* to small businesses when funds are not otherwise available on reasonable terms from non-Federal sources. *Kimbrell Foods*, 440 U.S. at 719 n.3 (emphasis added). A section 7(a) loan may be "(i) [a] direct loan by SBA; (ii) [a]n immediate participation loan by a Lender and SBA; or (iii) [ a] guaranteed loan (deferred participation) by which SBA guarantees a portion

16

of a loan made by a Lender." 13 C.F.R. § 120.2(a)(1). The SBA establishes "general policies … which shall govern the granting and denial of applications for *financial assistance* by the [SBA]." 15 U.S.C. § 631(d) (emphasis added). "The SBA prefers to guarantee private loans rather than to disburse funds directly." *Kimbrell Foods*, 440 U.S. at 719 n.3 (citations omitted); *In re Gateway Radiology Consultants,* 983 F.3d at 1248.

On March 27, 2020, in response to the COVID-19 pandemic, and pursuant to Congress' declared public policy, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Section 1102 of the CARES Act temporarily created the PPP loan program to be administered by the SBA. When Congress created PPP, it placed the program under section 7(a) of the Small Business Act. *See* 15 U.S.C. § 636(a)(36); *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 409-10 (2d Cir. 2022); *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 224 (2d. Cir. 2021); *In re Gateway Radiology*, 983 F.3d at 1249. The CARES Act authorizes the SBA to approve PPP loans "under the same terms, conditions, and processes" as other section 7(a) loans, except that for PPP loans, Congress relaxed some of the eligibility requirements. 15 U.S.C. §636(a)(36)(B); *see Springfield Hosp.*, 28 F.4th at 410. The CARES Act provides that PPP loans will be forgiven, under certain circumstances (15 U.S.C. §636m), and that the SBA would pay the lender the amount forgiven, to the extent the borrower

used the funds for certain purposes, including for payroll expenses. *See* 15 U.S.C. §9005. The CARES Act granted the SBA emergency rulemaking authority to administer the PPP. *See* 15 U.S.C. § 9012.

PPP loans are intended to be federal financial assistance made pursuant to the "declared policy of Congress that the Government should aid, counsel, assist and protect, insofar as possible, the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation." 15 U.S.C.A. § 631(a). The SBA itself makes clear on its website that "[t]he Small Business Administration works with different organizations to provide *federal financial assistance* for certain small businesses." https://www.sba.gov/funding-programs/grants. Similarly, in discussing the availability of "COVID-19 *financial assistance programs*," the SBA includes the "Paycheck Protection Program." www.sba.gov/funding-programs/loans/covid-19-relief-options.

Like other Section 7(a) loans, PPP loans are made through private lenders. *See Springfield Hosp.*, 28 F.4th at 423. The SBA adopted regulations regarding the loan programs that it administers, including PPP loans. It is undisputed that the SBA has incorporated Title IX into its Regulations. *See* 13 C.F.R. §113.100. Title IX prohibits any person from being excluded from participation in, denied the benefit of, or be subject to discrimination under any education program or activity receiving

18

Federal financial assistance. 20 U.S.C. §1681(a). The Small Business Act makes clear that an applicant must provide an assurance, "satisfactory to the designated agency official, that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 13 C.F.R. §113.115. Each recipient is required to designate at least one employee to coordinate its efforts and responsibilities under Title IX, including any investigation of any complaint communicated to such recipient alleging any actions that would be prohibited by these Title IX regulations. The recipient shall notify all its students and employees the name of the employee(s) so designated. *Id.* Similarly, the recipient must adopt and publish grievance procedures providing for "prompt and equitable resolution" of student complaints for conduct prohibited under Title IX. *Id*.

The Regulations contain both "general" and "specific" prohibitions against discrimination on the basis of sex. "[N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic … or other education program … that receives Federal financial assistance." 13 C.F.R. §113.400. The SBA Regulations contain "Specific prohibitions" that provide in pertinent part, that:

> in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex . . . [t]reat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; . . . [p]rovide

19

different aid, benefits, or services or provide aid, benefits, or services in a different manner; [d]eny any person any such aid, benefit, or service; [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment; . . . or [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

*Id.*

An entity is a recipient of Federal financial assistance regardless of whether it receives the Federal financial assistance directly or indirectly. *See Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984); *see also* 34 C.F.R. §106.2(i) (Recipient means any . . . public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.). Covered educational institutions include "any public or private preschool, elementary, or secondary school…." 20 U.S.C. § 1681(c). "An entire corporation, partnership, or other private organization…[w]hich is principally engaged in the business of providing education" also qualifies as an "education program." 20 U.S.C. § 1687(3)(A)(ii); *see also* 34 C.F.R. § 106.2(h)(3)(i)(B). As a private K-12 school, CFA clearly meets the definitions of "recipient", "education institution" and "education program." JA132.

The SBA's regulatory definition of Federal financial assistance encompasses (1) "[a] grant or loan of Federal financial assistance" and (2) "[a]ny other contract,

agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty." 13 C.F.R. § 113.105. The district court held that a PPP loan is "federal financial assistance" subject to Title IX based upon both of the above referenced categories. JA133, JA135, JA157-158.

Even if the SBA's regulatory provisions were not enough, the PPP loan application submitted by CFA expressly provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice . . . on the basis of categories cited in 13 C.F.R., Parts 112, 113 and 117 of SBA Regulations." JA120. The SBA required the submission of this PPP *Borrower* Application Form. *See Albino Constr. Co., Inc. v. Wells Fargo Bank, Nat'l Ass'n*, No. CV 21-35, 2021 WL 2529811, at 1 (E.D. Pa. June 17, 2021).

What CFA fails to recognize, much less concede, is that this "assurance" expressly provided in its own application is mandated by the SBA regulations when it provides "Federal financial assistance" to small businesses.

> (a) General. Either at the application stage or the award stage, Federal agencies must ensure that applications for Federal financial assistance or awards of Federal financial assistance contain, be accompanied by, or be covered by a specifically identified assurance from the applicant or recipient, satisfactory to the designated agency official, that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations. An assurance of compliance with these Title IX regulations shall not be satisfactory to the designated agency official if the applicant or

21

recipient to whom such assurance applies fails to commit itself to take whatever remedial action is necessary in accordance with § 113.110(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior to or subsequent to the submission to the designated agency official of such assurance.

(c) Form.
(1) The assurances required by paragraph (a) of this section, which may be included as part of a document that addresses other assurances or obligations, shall include that the applicant or recipient will comply with all applicable Federal statutes relating to nondiscrimination. These include but are not limited to: Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681–1683, 1685–1688).

13 C.F.R. §113.115. CFA continues to argue that it is not subject to Title IX, thereby completely ignoring the assurances and representations found in its own application, mandated by the SBA. CFA's Application also provides that its submission "is required to make a determination regarding eligibility for *financial assistance*." JA119. CFA received a "SBA Loan Number," it was given a "Loan Name," and the loan agreement itself even references the financial assistance as a "loan." JA94, JA99. Other than a footnote, CFA simply ignores the language contained in its PPP loan application and the assurances CFA was mandated to agree upon pursuant to the SBA regulations. CFA acknowledged in its own Application not only that it would be receiving financial assistance, but that it would comply with civil rights laws, including Title IX.  It is not surprising, therefore, that CFA fails to provide any explanation for its certification in the PPP loan application that CFA would comply

22

with the civil rights laws, including those provided in 13 C.F.R. Part 113. It is completely disingenuous for CFA to *now* contend that it was not the recipient of Federal financial assistance and subject to the provisions of Title IX, when based upon representations made by CFA in its own borrower application to the contrary, CFA was approved for a $1,253,949.00 PPP loan, which has been forgiven.

CFA also ignores what the SBA provided by way of answers to various "FAQ's" regarding PPP loans, including: "What legal requirements will be imposed on my organization as a result of our receipt of this Federal financial assistance?" The SBA makes clear that "[r]eceipt of a loan through any SBA program constitutes Federal financial assistance and carries with it the application of certain nondiscrimination obligations.  Any legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply."  SBA Faith-Based Organizations FAQ (Apr. 3, 2020) https://www.sba.gov/sites/default/files/2020-04/SBA%20Faith-Based%20FAQ%20Final.pdf.

### A. CFA's PPP Loan constitutes Federal financial assistance regardless of First Carolina Bank's status as a private lender, thereby subjecting CFA to Title IX claims.

CFA contends that the PPP Loan to CFA was not a grant or loan of Federal financial assistance because it was privately funded by First Carolina Bank. CFA argues that a grant or loan is only "federal financial assistance" if it is comprised of

"federal funds." The district court thoroughly explained why CFA's "privately funded" theory was insufficient. JA133-135. As was made clear in *Springfield Hospital*, 28 F.4th at 423, "the PPP is, in substance and in form, a loan program." The Cares Act itself uses the word "loan" about 75 times to describe the PPP. *See id*. A lender "approved to make loans are loans of federal financial assistance made through private lenders." JA134 *citing NCAA v. Smith*, 525 U.S. 459, 468 (1999); *Peltier v. Charter Day School, Inc.,* No. 20-1001, 2022 WL 2128579, at \*14 (4th Cir. June 14, 2022) (stating a party may receive Federal financial assistance through intermediaries). "The takeaway is clear: the $659 billion disbursed to borrowers through the PPP are loans, not grants." *Springfield Hosp.* 28 F.4th at 423 *citing Tradeways, Ltd. v. United States Dep't of the Treasury*, No. CV ELH-20-1324, 2020 WL 3447767, at \*17 (D. Md. June 24, 2020).

The district court went into further detail with respect to CFA's loan documents, which bolsters the conclusion that it was a loan of Federal financial assistance.

> The note First Carolina Bank issued to CFA has the SBA's logo at the top of the first page and prominently states on the first page that the note is part of the PPP. The loan agreement confirms that CFA applied to First Carolina Bank "for a SBA 7(a) Paycheck Protection Program loan." And the loan agreement states that First Carolina Bank made the loan "subject to the terms and conditions herein set forth and in accordance with the CARES Act, PPP Regulations and the Application." Moreover, the borrower's certification states that First Carolina Bank was making a "U.S. Small Business Administration ('SBA') guaranteed loan." The note, loan agreement, and borrower's

24

certification also contain an SBA loan number and loan name. The interest rate on the loan was subject to change only "in accordance with SBA Standard Operating Procedures." When First Carolina Bank disbursed the funds to CFA, First Carolina Bank and CFA executed an SBA Form 1050 to confirm that "the loan proceeds were disbursed and received and will be used in accordance with the Use of Proceeds section of the Authorization, including any and all SBA/Lender approved modifications." Thus, although First Carolina Bank, a private lender, issued the loan, CFA's loan documents indicate First Carolina Bank did so pursuant to and as a result of the SBA's lending authority under the CARES Act, making CFA's PPP loan a "loan of Federal financial assistance."

JA134-135.

Despite the district court's holding, and thorough analysis, CFA continues to misconstrue the type of loan it received by using the terms "private lender" and "private loan" interchangeably. These attempts are simply unavailing. This was not a "private loan" issued by First Carolina Bank. Instead, it was an SBA approved PPP loan made through an approved lender, First Carolina Bank. CFA's argument that it did not receive federal funds centers around the misguided notion that First Carolina Bank did not receive the funds from SBA *before* they were disbursed to CFA, and therefore, the funds do not constitute "federal" funds.

This certainly is not a novel issue as the district court made clear in its Order, and the court's reasoning is firmly rooted in decades of precedent. For PPP loans specifically, Congress provided that "a lender approved to make loans under this subsection shall be deemed to have been *delegated* authority by the Administrator to make and approve covered loans." JA134 *citing* 15 U.S.C. § 636(a)(36)(F)(ii)(i)

25

(emphasis added). This is also made clear in the Loan Application Form. JA112 (All PPP loans are processed by all Lenders under delegated authority from SBA).

As the district court correctly pointed out, *Grove City Coll. v. Bell*, 465 U.S. 555, 104 S. Ct. 1211, 79 L.Ed.2d 516 (1984), established this "linked" framework with respect to federal funds. In *Grove City*, defendant university, in an effort to avoid federal oversight with regard to Title IX, refused to take any federal funding, opting instead to allow students to apply for Basic Educational Opportunity Grants (BOG) to pay for their tuition. *Id*. at 555. The Supreme Court held in *Grove City* that because the funds could only be used to pay for tuition, despite the students acting as an intermediary the university was the intended recipient and thus the recipient of Federal Financial Aid. *Id*. at 564.

This same logic was applied by the Fifth Circuit in *Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*, 765 F.2d 1278, (5th Cir.), amended, 777 F.2d 329 (5th Cir. 1985), when a doctor who provided services in a hospital held herself out to be an independent contractor paid from the hospital's funds independent of any Medicare funds received by the hospital. The Fifth Circuit rejected this argument holding that "[Doctor's] revenue was in fact linked to the hospital's receipt of Medicare and Medicaid funds even if the terms of their contractual agreement created a theoretical moat—the androgynous 'general fund'—between them." *Id*. at 1289. The Court distinguished Doctors from other contractors saying:

26

> Unlike the hospital's privately-contracted mower of lawns, sweeper of floors, or supplier of aspirin, [Doctor] contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid. That the federal check does not bear [Doctor's] name is no answer to the fact that the check would not have been written at all were it not for [Doctor's] performance as a de facto subdivision of Northwest.

*Id*. at 1290.

In *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607, 106 S. Ct. 2705, 91 L.Ed.2d 494 (1986), the Supreme Court clarified as the Fifth Circuit did in *Frazier* that the chain linking recipients of payments to funds loosely and distantly tied to Federal Aid is not infinite. In *Paralyzed Veterans* a group of veterans brought suit against airlines under the theory that federal aid to airports, which in turn paid airlines, and the federal government's funding of the air traffic control system constituted federal financial aid to airlines. The court found these links to be too tenuous. *Id*. "Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not follow the aid past the recipient to those who merely benefit from the aid." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986).

In *Graves v. Methodist Youth Servs., Inc.*, 624 F. Supp. 429, 433 (N.D. Ill. 1985), the same is true. As CFA attempts to do in this case, the defendant in *Graves* argued that it was not a recipient of federal funds under Title VI given that it did not receive "direct" assistance. *See Graves*, 624 F. Supp. at 432. In that case, the

27

defendant received its funding from the Department of Children and Family Services (DCFS), and then DCFS was reimbursed by the federal government. *Id*. at 430-31. The defendant contended that the money it received from DCFS at the time of distribution was the property of the state, even though it was reimbursed with federal funds. *Id*. at 431. The court held that "when defendant received its funding from DCFS which was reimbursed by the federal government, this was equivalent to Grove City College receiving indirect federal funds through its students...." *Id*. at 433. "[T]his court concludes that defendant indirectly received federal funding... and it is subject to the Rehabilitation Act." *Id*.

Here, it is clear that CFA was the intended recipient of federal funds. The SBA's use of an intermediary, in the form of a bank, does not break the link between the Federal financial assistance under PPP and the intended recipient, CFA. CFA's insistence that they were the recipient of a "private loan" from a "private institution" is a deliberate mischaracterization of the situation. Congress placed the PPP under section 7(a), which "concerns the [SBA] Administrator's authority to make loans to any qualified small business, either directly or through a lender on a guaranteed basis." JA134 *citing Tradeways*, Ltd., 2020 WL 3447767, at *17. But for Congress's action in allocating funds under PPP to be distributed by SBA, CFA would have never received the "loan." It was not a private loan, and instead, federal funds from the SBA, distributed through an intermediary, First Carolina Bank, to CFA. CFA,

like the defendant in *Graves,* places an outsized emphasis on who held the funds at the time of disbursement while deliberately ignoring the actual source of the funds and the role of the lender in this arrangement.

CFA's reliance on *NCAA v. Smith*, 525 U.S. 459 (1999) to support its position is also misplaced. In *NCAA*, the plaintiff did not even allege in the complaint that NCAA "is a recipient of federal financial assistance." *Id.* at 459. Instead, plaintiff simply argued that the NCAA governs the *federally funded intercollegiate athletics programs of its members*, and therefore, the NCAA benefitted *economically* from its members' receipt of federal funds. *Id.* (emphasis added). As the Supreme Court correctly pointed out, "[u]nlike the earmarked student aid in *Grove City*, there is no allegation that NCAA members paid their dues *with federal funds earmarked for that purpose*." *Id.* at 460. (emphasis added). Therefore, NCAA was not a "recipient" itself. *Id.* In that case, it was the NCAA *members* that were the recipient of federal funds, not the NCAA.

Clearly, as expressed above, that is not the case at bar. PPP borrowers are Congress' intended recipients, and therefore, not merely economic beneficiaries of another's receipt of Federal financial assistance. In addition to CFA being the intended recipient of federal funds, unlike in *NCAA*, Appellees alleged the same in their Amended Complaint. JA12-13, JA64, JA70. The loan documents once again further emphasize CFA being the intended recipient. Under section 3.2 under the

loan agreement, it identifies the "borrower" (CFA) as the "eligible recipient" (as defined in the CARES Act). JA100. Next, even in the SBA Form 1050, Settlement Sheet, which provides instructions for completing the Form 1050, under (2), the instructions provide that the "Use of Proceeds" section should indicate the "name of the payee (must identify the *ultimate recipient, not an intermediary such as a title company*)." JA107. Despite CFA's continued reluctance to refer to itself as the "recipient," pursuant to the executed SBA Form 1050, CFA identifies itself as such under the "use of proceeds" section. JA108.

Under PPP, "private lenders" bore no risk of loss as they were not dealing with their own funds but rather those of the federal government. SBA relied on a network of lending partners under 7(a) to distribute PPP funds to eligible recipients, with whom these lenders already had relationships. These partners would distribute funds to provide immediate relief to intended recipients in need due to the Covid-19 pandemic. Once the funds were distributed, one of three things would happen:

1) SBA would confirm the recipient's eligibility, refund the lending partner, and the "loan" would be forgiven;

2) SBA would determine that the recipient was not eligible or used the funds for improper activities under PPP, and the funds would be recalled. Then the recipient would repay those funds to the institution, or

3) the ineligible recipient would fail to repay the funds and "default" on their "loan" and the federal government would reimburse the lending partner.

At no time did the lender bear any risk because they were not making "private loans," they were instead distributing federal funds in the form of financial aid. It is without dispute that the SBA provided federal funds on June 15, 2021, when the SBA also forgave CFA's PPP Loan. JA121 (Loan forgiveness notice from the SBA in the amount of $1,253,949.00).

Contrary to CFA's contentions, the SBA Regulations adopting Title IX made clear that any "loan of financial assistance" constitutes "Federal financial assistance." 13 C.F.R. §113.105. CFA suggests what it received is not a "loan," but simply a "guaranty" from SBA. Undeniably, CFA received much more than a guarantee; it received Federal financial assistance in the form of the forgiven PPP loan, thereby subjecting CFA to Title IX.

### B. CFA's PPP Loan was not a contract of guaranty, and accordingly, CFA is not excluded from Title IX claims.

As the district court correctly held, "[e]ven if PPP loans are not "loans of Federal financial assistance because the loans are issued by private lenders, they are still Federal financial assistance because they are the result of an "arrangement which has as one of its purposes the provisions of assistance to any education program or activity." JA135 (citations omitted). The PPP structure, with lenders making loans to borrowers, fits the definition of arrangement. JA135.

> An arrangement is the action of arranging or disposing in order, an arranged condition, orderly disposition, order, a settlement of mutual relations or claims between parties; and adjustment of disputed or

debatable matters, a settlement by agreement, or a disposition of measures for the accomplishment of a purpose; preparations for successful performance.

JA133 *citing Arrangement*, *Oxford English Dictionary* (online ed.). The PPP is a "disposition of measures for the accomplishment of" Congress' purpose to "help businesses make payroll and pay operating expenses in order to help keep people employed through the economic downturn" caused by COVID-19. JA135 *citing In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020).

> In this arrangement, the private lender is the intermediary through which Congress's intended recipients (i.e., businesses, organizations, and other entities hurt by the COVID-19 pandemic) receive access to capital for which they might not otherwise have qualified without the federal government's guarantee to the lender to ensure repayment. Thus, a borrower receiving a PPP loan receives federal financial assistance indirectly through an intermediary (i.e., the private lender) under an arrangement created by Congress and is a recipient of federal financial assistance for the duration of the loan.

JA135 *citing NCAA*, 525 U.S. at 468; *Paralyzed Veterans*, 477 U.S. at 607; *Grove City*, 465 U.S. at 564; *Peltier*, 2022 WL 2128579, at *14. And because PPP borrowers are Congress's intended recipients, they are not merely economic beneficiaries of someone else's receipt of Federal financial assistance. JA135 *citing NCAA*, 525 U.S. at 468; *Paralyzed Veterans*, 477 U.S. at 607.

Having failed to provide this Court with any authority that it was not the recipient of Federal financial assistance, CFA attempts to disregard its own PPP Loan Application and the applicable CFR's, and instead, seeks to equate their status

as a borrower to that of a participating SBA lender, contending that CFA's PPP loan was a "contract of insurance or guaranty" that does not qualify as "Federal financial assistance" under subsection (5) of 13 C.F.R. § 113.105. Of course, CFA received much more than a guarantee; it received Federal funds through the PPP program, initially in the form of a "loan," but ultimately, when that loan was forgiven, Federal funds for which CFA will never be obligated to repay. Importantly, as expressed above, the PPP loan was a grant or loan of Federal financial assistance, and therefore, CFA's contention that the PPP loan was nothing more than a contract of guaranty does not bar a Title IX claim against CFA.[4]

Even if the PPP loan was not a "grant or loan of Federal financial assistance," and instead an "arrangement which has as one of its purposes the provision of assistance to any education program or activity," as the district court recognized, CFA's argument that the PPP loan was a "contract of guaranty" still fails. The guarantee by SBA of the PPP loan does not make it a contract of guaranty. JA135-137. A guaranty is a "promise to answer for the payment of some debt…in case of the failure of another who is liable in the first instance." JA136 *citing* Guaranty, Black's Law Dictionary (11th ed. 2019). Other courts have defined the same meaning. A guaranty is "the promise to answer for the payment of some debt or the

---

[4] As 13 C.F.R. § 113.105 makes clear, the alleged "contract of insurance or guaranty" exclusion is only applicable to subsection (5), not subsection (1) regarding a grant or loan of Federal financial assistance.

performance of some obligation, on default of such payment or performance, by a third person who is liable in the first instance ... It is an obligation to answer for the debt of another." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (citations omitted); *Weissman v. Sinorm Deli, Inc.,* 88 N.Y.2d 437, 646 N.Y.S.2d 308, 669 N.E.2d 242, 246 (1996) ("A guaranty ... is a contract of secondary liability ... [A] guarantor will be required to make payment only when the primary obligor has first defaulted."); *United States v. Vahlco Corp.,* 800 F.2d 462, 465 (5th Cir. 1986) (A guaranty is an undertaking by the guarantor to answer for the payment of some debt ... of another person in the event of default.). "A guaranty of payment is an absolute promise to pay the debt of another if the debt is not paid by the principal debtor." *Grout Dr. Glob. Franchise Corp. v. Groutman, Inc.*, No. 7:14-CV-105-BO, 2015 WL 2353698, at *3 (E.D.N.C. May 15, 2015) (citations omitted).

As the district court made clear, "[t]he PPP loan itself is not such a promise but is instead the instrument that creates the debt to be guaranteed." JA136. At no point was there a "contract of guaranty" between the borrower, CFA, and the SBA. CFA continues alluding to this PPP loan as a contract of guaranty, yet, CFA has failed to establish that a "contract" between CFA and the SBA even exists, and it is certainly not part of the record before this Court. Instead, the CARES Act makes clear that CFA received a PPP loan that will be forgiven (15 U.S.C. §636m) and the SBA would pay the lender the amount forgiven, so long as the borrower used the

34

funds for certain purposes. *See* 15 U.S.C. §9005. Clearly, SBA did not "promise to answer" CFA's loan on the condition of CFA's failure to answer for the payment of the PPP loan. Instead, the PPP loan was completely forgiven, which was never conditioned upon CFA's failure to pay the debt.

Next, in addition to its holding that PPP is a "loan" under the CARES Act, the court in *Springfield Hospital* made clear that "forgiveness is neither automatic nor guaranteed." 28 F. 4th at 424. "A borrower must apply for forgiveness, which will only be granted if specified criteria are met… and the CARES Act places several additional conditions upon obtaining forgiveness." *Id*. "A forgiveness option, favorable as it is, cannot alter the structure of what a loan forgiveness program fundamentally is—namely, a program to forgive loans." *Id*.

In *United States v. Baylor Med. Ctr.*, 736 F.2d 1039, 1048 (5th Cir. 1984), the Fifth Circuit made clear what constitutes a "contract of insurance or guaranty." The court held that "as the legislative history makes abundantly clear, in excluding 'contracts of insurance or guaranty' …, Congress intended to prevent Title VI from reaching individually owned homes financed with federally guaranteed mortgages, or individual bank accounts in a bank with federally guaranteed deposits." *Id*. "In other words, Congress did not want Title VI to effect a nationwide Fair Housing Act." *Id*. The same interpretation and analysis led to the court's holding in *Butler v. Capital Fed. Sav.*, 904 F. Supp. 1230 (D. Kan. 1995). "Plaintiffs' only allegation

that defendant is a recipient of Federal financial assistance is the FSLIC insurance of its deposits." *Id*. "This is insufficient to state a claim under Title VI." *Id*.

Interestingly, the only case cited by CFA dealing with the "contract of insurance or guaranty" exception dealt with the plaintiff's contention that the bank received Federal financial assistance in the form of deposit insurance from the FDIC. *Marshall v. Webster Bank, N.A.*, No. 3:10-CV-908 JCH, 2011 WL 219693, at *7 (D. Conn. Jan. 21, 2011) (dismissing plaintiff's Title IV claim because, "assuming that FDIC deposit insurance is Federal financial assistance, it is federal assistance in the form of a guaranty or contract for insurance."). Clearly, the Fair Housing Act nor federally guaranteed deposits have any bearing or relevance to this case.

Yet, CFA contends that the district court's Order is clearly incorrect because it writes the contract of guaranty exception out of the law, and that the "contract of insurance or guaranty" exception "would never apply." This is false. This exception found at 13 C.F.R. 113.105, which forms the basis for CFA's assertion, simply makes clear that CFA is not subject to Title IX by virtue of having a federally insured deposit account at its own bank. The district court's ruling in no way affects this. Instead, the district court emphasized that a PPP loan is not the same as FDIC insured deposits and FHA loans. The "contract of guaranty" exception found at 13 C.F.R. 113.105 will continue to apply to CFA, and any other entity that operates education programs or activities and opens FDIC insured bank accounts. As is clear in *Baylor*

36

*Med. Ctr.* and *Butler*, it was not the intent of Congress for such programs to trigger compliance with the civil rights laws, and hence, the need for this exception. Here, Congress and the SBA made clear that recipients of PPP loans triggered compliance with civil rights laws, and despite CFA's own assurances that it would, CFA continues to ignore that.

Importantly, none of the cases cited by CFA to support its position that CFA's PPP loan was a "contract of guaranty" focus on a borrower's status, and accordingly, nothing about those cases apply to any issues in this case. In *Gallagher v. Croghan Colonial Bank*, a case relied upon by CFA, the Sixth Circuit Court of Appeals, in support of its finding that the defendant (bank) was not a recipient of federal aid, held that "coverage of the Rehabilitation Act does not follow federal aid 'past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement.'" 89 F.3d 275, 278 (6th Cir. 1996) *citing Hamilton v. Illinois Cent. R.R. Co.*, 894 F. Supp. 1014, 1022 (S.D. Miss. 1995) (emphasis added). The students receiving the loans were the intended recipients, not the bank. JA136-137. The court concluded that the defendant bank "did not receive Federal financial assistance for purposes of the Rehabilitation Act by disbursing loans to students pursuant to federal student loan legislation." *Gallagher*, 89 F.3d at 278.

37

In this matter, had Appellees filed a Title IX action against the lender, First Carolina Bank, or, said another way, if CFA was an SBA lender, only then would the CFA's argument have merit. As the district court made clear, if anyone had a contract of guaranty with the SBA, it was First Carolina Bank. JA136, JA159. "First Carolina Bank applied separately to the SBA for a guaranty of its loan to CFA, and CFA was not a party to that application." JA136, JA159 *citing Duke v. Reconstruction Fin. Corp*., 209 F.2d 204, 207 (4th Cir. 1954) (examining a contract of guaranty and concluding it "was a separate and distinct contract relation between the guarantors and the lender and merely collateral to the loan arrangement between" the lender and the borrower).

Instead, CFA was the intended recipient of a PPP loan, and therefore, the recipient of Federal financial assistance. As provided in *Gallagher*, given that CFA is the intended recipient of federal aid, it is subject to Title IX.  In addition, unlike the case in *Gallagher*, CFA students are not "employees" of an SBA lender. Even where courts have been presented with the question of whether a bank's participation in a SBA guaranteed loan program constitutes Federal financial assistance, courts have recognized that institutions/banks are subject to non-discriminatory regulations. *See Moore v. Sun Bank of N. Florida, N.A.*, 923 F.2d 1423 (11th Cir. 1991).

38

As further support for its contention that PPP is not a loan but "a contract of insurance or guaranty," CFA cherry-picks a line from *Springfield Hosp.,* 28 F.4th at 415 (The substance of the PPP conclusively demonstrates that it is, as described, a loan guaranty program, not a grant program). A deeper reading of *Springfield Hosp.* shows that in the context of section 525(a), the Second Circuit was distinguishing PPP as a loan guarantee program under section 7(a), with the term "other similar grant" as it appears in 525(a). *See* 28 F.4th 403. The court in *Springfield Hosp.* went on from the statement that CFA cites to conclude,

> We disagree and conclude that the PPP is, in substance and in form, a
> loan program that is not covered under Section 525(a). Although we
> recognize that we must analyze the substance of the PPP, rather than
> just its nomenclature, it is nevertheless significant that Congress chose
> to characterize the PPP as a "loan" in the CARES Act. Indeed, the
> CARES Act uses the word "loan" approximately 75 times when
> describing the PPP.. . . First, the structure of the PPP provides
> compelling support for our conclusion. . . . Congress placed the PPP
> within Section 7(a) of the Small Business Act—the SBA's primary
> mechanism for providing financial assistance to businesses—and
> authorized the SBA to adopt the same terms, conditions, and processes
> for PPP loans as for 7(a) loans.

*Springfield Hosp.,* 28 F.4th at 423; *see also* 11 U.S.C. § 525(a). Given the lack of precedent supporting CFA's argument, it cites to the "Congressional Research Service," which in its own disclaimer, provides that "[i]nformation in a CRS report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role." Cong. Research Serv., LSB10459, p. 5, Applicability

of Federal Civil Rights Laws to Recipients of CARES Act Loans 2 (May 1, 2020).

Regardless of the disclaimer, the CRS Report is certainly not definitive on whether

PPP Loans constitute federal funds.

> But less certain is whether receipt of guaranteed loans under the PPP subjects a recipient to these civil rights requirements… Because recipients of PPP loans receive federal funds from third parties rather than directly from the government, they <u>may not</u> be subject to the same requirements… Thus, the precise reach of these statutory and regulatory civil rights requirements for entities that receive PPP loans, but do not receive EIDL loans or grants, is <u>difficult to predict</u>.

*Id.* at 2-3 (emphasis added).

As set forth above, the SBA, however, pursuant to the CFR's, make clear that

recipients of PPP loans, as Federal financial assistance, are subject to the civil rights

laws, including Title IX. Although not binding on this Court, other district courts

have reached similar conclusions with respect to PPP loans constituting Federal

financial assistance at the motion to dismiss stage. *See E.H. by & through Herrera

v. Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681, at *6

(C.D. Cal. July 25, 2022) (Based on precedent in similar anti-discrimination suits,

the court finds that plaintiff has sufficiently alleged defendant's receipt of Federal

financial assistance in the form of PPP loans); *see Awah v. Mansfield Kaseman

Health Clinic*, 2021 WL 6197415 (D. Md. Dec. 30, 2021) (denying motion to

dismiss Title VI claims against defendant that received PPP loan); *Husbands v.

Financial Management Solutions, LLC*, No. GJH-20-3618, 2021 WL 4339436, at *8

(D. Md. Sept. 23, 2021) (finding allegations that a defendant was the recipient of Federal financial assistance sufficient to state a claim for relief under the Rehabilitation Act despite defendant's urging that it only received funds in the form of PPP loans disbursed under the CARES Act).

Accordingly, the Court should affirm the district court's Order denying Appellant's Motion to Dismiss Appellees' Title IX claims.

### III. THIS COURT SHOULD NOT VACATE THE DISTRICT COURT'S ORDER REGARDING APPELLEES' BREACH OF CONTRACT CLAIMS.

The only issue that has been appealed, and certified for interlocutory appeal, is whether a PPP loan constitutes Federal financial assistance that subjects a borrower to Title IX. JA162. The basis for this, as the district court pointed out, was that it involved a pure question of law, which would not require the Fourth Circuit to delve significantly into the facts of this case. JA162-163. As this Court has made clear, "§ 1292(b) review is not appropriate where, for example, the question presented 'turns on whether there is a genuine issue of fact or whether the district court properly applied settled law to the facts or evidence of a particular case.'" *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 341 (4th Cir. 2017) (citations omitted). Therefore, the only portion of the district court's order that has been certified, and is before this Court, is whether CFA's PPP loan constitutes Federal financial assistance subjecting it to Title IX. *See Fannin v. CSX*

*Transp., Inc.*, No. 88–8120, 1989 WL 42583, at *5 (4th Cir. Apr. 26, 1989) (per curiam) (unpublished opinion) (The portion of the order striking the fraud ground for avoiding the release was not certified and therefore would not be before us).[5]

In *Fannin*, this Court cited to *Miller v. Bolger,* 802 F.2d 660, 666 (3d Cir. 1986), to stand for the proposition that under § 1292(b), appeal is from the order certified, not from particular rulings embodied within in. No. 88–8120, 1989 WL 42583, at *3. However, even in *Miller*, the Third Circuit held that in "deciding whether to exercise that power, we are guided by prudential considerations." 802 F.2d at 666. "We have refused to reach an issue posed by an order appealed under section 1292(b) where that issue was not addressed by the district court," "or where the issue involved factual determinations better left to the district court." *Id*. at 666-67. Here, in certifying the Order for interlocutory appeal, the district court did not address the Appellees' breach of contract claims, nor did CFA appeal the district court's ruling on the same. Similarly, any decision to vacate the district court's order on Appellees' breach of contract claims would involve factual determinations, which are "better left to the district court."

Even assuming *arguendo* that this Court reverses the Order on the Appellees' Title IX claims, the Court's decision would not dispose of Appellees' breach of

---

[5] Appellees recognize pursuant to Local Rule 32.1, citation to unpublished opinions prior to 2007 is disfavored. In accordance with Fed. R. App. P. 32.1 (b) *Fannin* is available electronically on Westlaw.

contract claims. These claims are based upon the enrollment contract and student handbook incorporated therein between Appellees and CFA. This Court's decision would therefore have no bearing on the breach of contract claims arising out of the enrollment contract and student handbook, which expressly prohibits retaliation, bullying or harassment and expressly prohibits CFA imposing disciplinary sanctions and/or punishment inconsistent with the handbook. JA80-85.

28 U.S.C. § 1376 makes clear that it is the district court that has the discretion to "decline to exercise supplemental jurisdiction" over all other claims.[6] Therefore, even if CFA prevails on the Title IX claims, the Appellees' breach of contract claims, along with the claims alleged in their second amended complaint, if allowed by the district court, will still need to be litigated, either in state court or federal court at the district court's discretion. *See* 28 U.S.C. § 1376.

For these reasons, this Court should not vacate the district court's Order with respect to the Appellees' breach of contract claims and leave it to the discretion of the district court on whether it declines to exercise supplemental jurisdiction over any remaining claims.

---

[6] Although no party appealed the district court's dismissal of Appellees' intentional and negligent infliction of emotional distress claims *without prejudice*, on January 26, 2023, Appellees moved for leave from the district court to file a second amended complaint re-alleging intentional infliction of emotional distress claims on their and *in the alternative* claims for negligence against CFA, which is presently pending before the district court.

43

## CONCLUSION

For the foregoing reasons, the Court should affirm the Order entered by the district court.

This, the 22nd day of February, 2023.

SHIPMAN & WRIGHT, LLP
*Attorneys for Plaintiffs-Appellees*

By:    /s/ Gary K. Shipman
**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
**JAMES T. MOORE**
N.C. State Bar No.: 38377
**THOMAS R. HARVEY III**
N.C. State Bar No.: 57308
575 Military Cutoff Road, Suite 106
Wilmington, NC  28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752
Email: gshipman@shipmanlaw.com
       jmoore@shipmanlaw.com
       tharvey@shipmanlaw.com

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the part of the document exempted by Fed. R. App. P. 32(f) (cover page, table of contents, table of authorities, signature block, certificates of counsel, addendum, attachments):

This document contains <u>11,062</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional space typeface using Microsoft Word in 14-point Times New Roman.

Respectfully Submitted,

    This the 22nd day of February 2023.

               SHIPMAN & WRIGHT, LLP
               *Attorneys for Plaintiffs-Appellees*


By:   /s/ Gary K. Shipman
       **GARY K. SHIPMAN**
       N.C. State Bar No.: 9464
       575 Military Cutoff Road, Suite 106
       Wilmington, NC  28405
       Telephone: (910) 762-1990
       Facsimile: (910) 762-6752
       Email: gshipman@shipmanlaw.com